66 F.3d 502
 41 ERC 1241, 64 USLW 2185, 25 Envtl.
L. Rep. 21,513
 SSC CORP., Plaintiff-Counter-Defendant-Appellee,
v.
TOWN OF SMITHTOWN, Town Board of the Town of Smithtown, and
Patrick Vecchio, as Supervisor, Town of Smithtown,
Defendants-Counter-Claimants-Appellants.
 No. 1417, Docket 94-9192.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 21, 1995.
Decided Sept. 19, 1995.
 
 Michael J. Cahill, Sinnreich Wasserman Grubin & Cahill, Hauppauge, NY (James Joyce, John Zollo, of counsel) for defendants-counter-claimants-appellants.
 Leon Friedman, New York City (David L. Snyder, Snyder & Snyder, White Plains, NY, of counsel), for plaintiff-counter-defendant-appellee.
 Gordon J. Johnson, Deputy Bureau Chief, Environmental Protection Bureau, John J. Sipos, Assistant Attorney General, Dennis C. Vacco, Attorney General of the State of New York, for Amicus Curiae State of New York.
 Michael D. Diederich, Stony Point, New York, for Amici Curiae County of Rockland, Rockland County Solid Waste Management Authority, and New York State Association for Solid Waste Management.
 Frank L. Amoroso, Nixon, Hargrave, Devans & Doyle, Garden City, New York, for Amicus Curiae Town of Babylon.
 Robert M. Calica, Reisman, Peirez, Reisman & Calica, Garden City, New York, for Amici Curiae Town of Islip and Town of Brookhaven.
 Frederick Eisenbud, Cahn, Wishod & Lamb, Melville, New York, for Amici Curiae Anthony Leteri, USA Recycling, Inc., and Friendly Carting, Inc.
 Before: NEWMAN, Chief Judge, VAN GRAAFEILAND and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 A law professor at Harvard is said to have remarked facetiously, a generation ago, that the greatest constitutional cases had concerned the sale and distribution of milk. The story might well be apocryphal as well as hyperbolic but there is truth to the statement, evidenced by the ubiquity of milk in the Supreme Court's Commerce Clause jurisprudence.[1] Although the flood of milk cases has receded in recent years, it has given way to a federal docket that is just as clogged with--of all things--garbage. No fewer than six times in the past seven years has the Supreme Court granted certiorari to decide a case involving the disposal of solid or hazardous waste.[2]
 
 
 2
 Not long ago, municipalities took out the trash simply by hauling it to the local dump.[3] But as landfills have reached the bursting point, and as environmental regulations have burgeoned,[4] local governments have been forced to make significant investments and become more innovative in safely and legally disposing of trash. These investments and innovations include the multifarious transfer stations, recycling centers, and incinerators that have mushroomed throughout the land in the past decade.
 
 
 3
 Smithtown, New York, responded to the environmental and regulatory crisis by arranging with the neighboring town of Huntington for the construction of a garbage incinerator--an incinerator that would be owned and operated by a private company, but financed by the towns. The two towns hoped that the incinerator would stem the flow of solid waste filling up the town dump, put the garbage to practical use by generating electricity, and ensure a reliable method of waste disposal for town residents for years to come. As part of its overall solid waste plan, and to protect its financial investment in the incinerator, Smithtown pursued two parallel strategies. First, it passed a "flow control" ordinance that required all residential and commercial garbage generated in town to be disposed of at the incinerator, where Smithtown charges so-called "tipping fees" based on the amount of garbage dumped.[5] Second, Smithtown created a residential garbage collection district and entered into a contract with private garbage haulers to pick up all household garbage in the district. Under the terms of the contract, the haulers were required to bring that garbage to the incinerator.
 
 
 4
 The United States District Court for the Eastern District of New York (Thomas C. Platt, Chief Judge ) invalidated both the ordinance and contract under the dormant Commerce Clause of the United States Constitution,[6] relying on the Supreme Court's holding in C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), that a similar ordinance impermissibly discriminated against interstate commerce. Smithtown asks this court to distinguish the virtues of its flow control ordinance and residential garbage collection contract from the vices of the flow control ordinance struck down in Carbone. Smithtown contends primarily that its extensive financial stake in the local incinerator makes the town a "market participant" in the waste disposal market, and therefore exempts both its flow control ordinance and contract from the proscriptions of the Commerce Clause.
 
 
 5
 We conclude that Smithtown's flow control ordinance--enforceable by criminal fines and jail terms--clearly constitutes municipal regulation of the waste disposal market, not participation in that market, thus subjecting the ordinance to Commerce Clause scrutiny. Following the Commerce Clause analysis set forth by the Supreme Court in Carbone, we are compelled to find that the ordinance impermissibly discriminates against interstate commerce. On the other hand, we find that Smithtown's garbage hauling contract with SSC constitutes municipal participation in both the waste collection and disposal markets, and is thus free from the strictures of the Commerce Clause.
 
 
 6
 Accordingly, we affirm the district court's judgment striking down the flow control ordinance, but reverse its invalidation of the contract.
 
 I. FACTS
 A. Background
 
 7
 Smithtown is a municipality in northwestern Suffolk County on Long Island, New York, with a population of approximately 125,000. In the mid-1980s, following the adoption of various federal[7] and New York State[8] policies designed to upgrade or replace old landfills that were either full or unsafe, Smithtown began negotiations with the neighboring town of Huntington to provide joint waste disposal service for residents of both towns. The towns entered into a municipal agreement, authorized by special state statute, to share Smithtown's existing landfill and Huntington's incinerator, whose construction was underway but incomplete at the time of the agreement.[9]
 
 
 8
 The incinerator was built and is operated by a private company, Ogden Martin Systems ("Ogden"),[10] on land owned by the town of Huntington. The service contract between Ogden and the towns stipulates that Ogden "is the sole owner" of the incinerator, and that the towns are "customer[s] only."The towns financed construction of the incinerator through tax-free bonds issued by the New York State Environmental Facilities Corporation, a public authority. The bonding authority lent the proceeds from the bonds to Ogden to build the incinerator. These bonds are secured primarily by a twenty-five year contractual obligation of Smithtown and Huntington to reimburse Ogden for the construction and operation costs of the incinerator. This obligation is known as the "Service Fee," and is payable regardless of whether any waste is delivered to the incinerator. Accordingly, the towns pay the Service Fee to Ogden, which repays the state bonding authority, which in turn repays the bondholders. To satisfy its share of the Service Fee, Smithtown relies on funds from two sources: (1) ad valorem property taxes and (2) tipping fees at the incinerator.
 
 
 9
 In return for paying the Service Fee, Smithtown and Huntington own exclusive rights to decide what waste may be disposed at the incinerator, and thus to charge tipping fees for garbage that is dumped there.
 
 B. The Flow Control Ordinance
 
 10
 To ensure a steady flow of garbage to the Huntington incinerator (and thus to ensure a steady flow of tipping fees), Smithtown enacted a "flow control" ordinance in 1991 that provides as follows:
 
 
 11
 No person authorized to collect or transport acceptable waste within the Town of Smithtown shall dispose of acceptable waste generated within the Town of Smithtown except at a solid waste management facility designated by the Town Board pursuant to this section.
 
 
 12
 SMITHTOWN CODE Sec. 177-17(B) (1994).[11] Pursuant to this ordinance, Smithtown's Town Board designated the Huntington incinerator as the disposal site for both residential and commercial garbage[12] generated in town. For recyclables, the Board designated the adjacent town recycling center. Smithtown charges tipping fees of $65 per ton of garbage dumped at the incinerator, but imposes no charges for recyclables brought to the recycling center. Id. Sec. 177-83(D)(1)-(2). The town charges tipping fees for garbage only in order to encourage haulers to divert recyclables out of the solid waste stream.
 
 
 13
 Violation of the flow control ordinance is an unclassified misdemeanor, punishable by a fine of up to $5,000 and up to 60 days' imprisonment. Id. Sec. 177-102.
 
 C. The Improvement Contract
 
 14
 The second major step in Smithtown's solid waste plan was to arrange for municipal garbage collection and disposal for all town residents. In 1991, the town divided its residential areas into ten improvement districts and solicited competitive bids for waste collection services in each district.[13] The town also drew up a standard form contract (the "Improvement contract"), which all successful bidders had to sign, and which required them to dispose of residential garbage at the Huntington incinerator. Accordingly, they must factor into their bids the $65 per ton tipping fee charged by Smithtown for using the incinerator, and an estimate of the amount of waste generated in the district for which they are bidding.[14]
 
 
 15
 Smithtown awarded seven of the ten residential contracts to SSC. SSC began to pick up household garbage in January 1992. In compliance with contract requirements, SSC used Smithtown's published tipping fee of $65 per ton at the Huntington incinerator to arrive at a proposed annual disposal cost of approximately $92 per household. This disposal cost, added to an estimate of $126 per household for collection service, amounted to a total bid of $218 per household in 1994.
 
 
 16
 Smithtown assessed that $218 as a user fee on each residential homeowner's annual property tax bill. The town then used that user fee to pay SSC under the Improvement contract.
 
 
 17
 In early April 1994, Smithtown accused SSC of breaching the contract by diverting town residential garbage to disposal facilities other than the Huntington incinerator. SSC was allegedly pocketing the difference between the $65 per ton tipping fees built into the contract and reimbursed by Smithtown, and lower fees charged at other disposal facilities. By resolution of the Town Board, Smithtown withheld more than $750,000 in contract payments from SSC.
 
 
 18
 On April 28, 1994, SSC filed this action pursuant to 42 U.S.C. Sec. 1983 (1988), seeking to enjoin Smithtown from enforcing the contractual provisions and the flow control ordinance, to the extent that those provisions required the hauler to deliver all town garbage to the Huntington incinerator.[15] SSC claimed that both the contract and the ordinance violated the Commerce Clause. Smithtown counterclaimed for breach of contract.
 
 
 19
 After the Supreme Court handed down its decision in C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), Chief Judge Platt granted summary judgment for SSC. In a terse oral ruling, the judge stated that the Smithtown waste control program--both the flow control ordinance and the Improvement contract--violated the dormant Commerce Clause under Carbone. Smithtown appeals.
 
 II. DISCUSSION
 
 20
 A. The Legal Standard: The Dormant Commerce Clause & the Market Participant Doctrine
 
 1. Dormant Commerce Clause
 
 21
 The Commerce Clause is primarily an affirmative grant of power to Congress. "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. CONST. art. I, Sec. 8, cl. 3. The power to regulate interstate commerce is extraordinarily far-reaching[16] and authorizes Congress to preempt a broad spectrum of state regulations. If Congress has not exercised its commerce powers in a given area, states can generally legislate over that area until Congress chooses to step in. Thus, most laws regulating commerce are written upon a sort of legal palimpsest: state laws remain on the books until Congress chooses to overwrite them.
 
 
 22
 The Supreme Court, however, has long interpreted the Commerce Clause "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). Accordingly, the Court has treated at least some core area of interstate commercial regulation not as a palimpsest, but rather as a tabula that must remain rasa until Congress decides to legislate. Whether or not the Founders intended this "negative" or "dormant" component to the Commerce Clause has been hotly debated.[17] In any event, federal courts have for more than 150 years invoked the Commerce Clause to scrutinize state regulations affecting interstate commerce, even in the absence of conflicting congressional legislation. See generally Southern Pac. Co. v. Arizona, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945); Case of the State Freight Tax, 82 U.S. (15 Wall.) 232, 272, 21 L.Ed. 146 (1872) ("[T]he domain of the [federal government] should be preserved free from invasion, and ... no State legislation should be sustained which ... assumes to regulate, or control subjects committed by th[e] Constitution exclusively to the regulation of Congress."); Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1851) ("Whatever subjects of this [commerce] power are in their nature national, or admit only of one uniform system, or plan or regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress."); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 199-200, 6 L.Ed. 23 (1824) (Marshall, C.J.) (implying that a state oversteps its powers when it regulates interstate commerce because "it is exercising the very power that is granted to congress, and is doing the very thing which congress is authorized to do").
 
 
 23
 In applying the dormant Commerce Clause, the courts have identified guiding principles--limiting "protectionist" state legislation and fostering the development of a unified national market--that presumably motivated the Founders to endow Congress with the affirmative power to regulate commerce. As Justice Jackson wrote:
 
 
 24
 Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.
 
 
 25
 H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949), quoted in West Lynn Creamery, Inc. v. Healy, --- U.S. ----, ----, 114 S.Ct. 2205, 2218, 129 L.Ed.2d 157 (1994). The Court has defined "protectionist" state legislation as "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273-74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988).
 
 
 26
 To implement the goals of curbing local protectionism and facilitating a national market, the courts have derived from the Commerce Clause limitations on the states' abilities to legislate in service of parochial interests. State regulations that discriminate against interstate commerce are subject to a "virtually per se rule of invalidity." City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). By "discrimination," we mean "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste Sys., Inc. v. Department of Envtl. Quality, --- U.S. ----, ----, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994). "But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 [ (1970) ] ...." City of Philadelphia, 437 U.S. at 624. In Pike, the Court explained that a state regulation having only "incidental" effects on interstate commerce "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. at 847. When weighing burdens against benefits, a court should consider both "the nature of the local interest involved, and ... whether it could be promoted as well with a lesser impact on interstate activities." Id.
 
 2. The Market Participant Exception
 
 27
 The Commerce Clause only grants to Congress--and correspondingly withholds from the states--the power to "regulate Commerce ... among the several States." (emphasis added). Because the power conferred by the Constitution is the power to "regulate," the strictures of the dormant Commerce Clause are not activated unless a state action may be characterized as a "regulation." At the threshold of its Commerce Clause analysis, the Supreme Court has drawn an important distinction between "regulation" of, and "participation" in, a market. When a state engages in market "participation"--that is, when it enters the open market as a buyer or seller on the same footing as private parties--there is less danger that the state's activity will interfere with Congress's plenary power to regulate the market. As the Court has explained, the Commerce Clause "restricts 'state taxes and regulatory measures impeding free private trade in the national marketplace,' but '[there] is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market.' " Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 289, 106 S.Ct. 1057, 1062, 89 L.Ed.2d 223 (1986) (quoting Reeves, Inc. v. Stake, 447 U.S. 429, 437, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980)). Pursuant to this doctrine--the "market participant" exception to the dormant Commerce Clause--states are permitted to enter a market with the same freedoms and subject to the same restrictions as a private party.[18] To the extent that a state is acting as a market participant, it may pick and choose its business partners, its terms of doing business, and its business goals--just as if it were a private party.
 
 
 28
 The Supreme Court introduced the market participant doctrine in Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), which upheld a Maryland program that offered bounties to scrap processors to destroy abandoned automobile hulks. Because Maryland required out-of-state processors, but not in-state processors, to submit burdensome documentation to claim their bounties, the state effectively favored in-state processors over out-of-state processors. The Court held that because the state was merely attaching conditions to its expenditure of state funds, the Maryland program affected the market no differently than if Maryland were a private company bidding up the price of auto hulks. Because the state was not "regulating" the market, its economic activity was not subject to the antidiscrimination principles underlying the dormant Commerce Clause--and the state could impose different paperwork burdens on out-of-state processors. "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." Id. at 810, 96 S.Ct. at 2498 (footnotes omitted).
 
 
 29
 The Court next invoked the market participant exception in Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), permitting South Dakota to confine sales from a state-owned cement factory to state residents. Noted the majority:
 
 
 30
 [S]tate proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedom from federal constraints, including the inherent limits of the Commerce Clause.
 
 
 31
 447 U.S. at 439, 100 S.Ct. at 2278. Like any other purveyor of cement, South Dakota enjoyed " 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " Id. at 438-39, 100 S.Ct. at 2278 (quoting United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). The Court reiterated this holding in Wyoming v. Oklahoma, 502 U.S. 437, 458, 112 S.Ct. 789, 802, 117 L.Ed.2d 1 (1992), where the Court stated that under the market participant doctrine, Oklahoma faced no Commerce Clause obstacle in directing its state-owned power plants to burn at least ten percent Oklahoma-mined coal.[19] Like any other buyer in the coal market, Oklahoma could buy its coal from whomever it pleased--meaning that the state could favor its own residents when spending state funds.
 
 
 32
 In White v. Massachusetts Council of Construction Employers, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), the Supreme Court held that the city of Boston was a participant in the labor market, and thus was not "regulating" commerce in violation of the Constitution in requiring all city-funded construction projects to be performed by a work force of at least fifty percent Boston residents. The practical effect of this order was to require all city building contractors to hire half of their workers from Boston. While the Court agreed that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," it declined to
 
 
 33
 define those limits with precision, except to say that we think the Commerce Clause does not require the city to stop at the boundary of formal privity of contract. In this case, the [employment mandate] covers a discrete, identifiable class of economic activity in which the city is a major participant. Everyone affected by the [mandate] is, in a substantial if informal sense, "working for the city."
 
 
 34
 Id. at 211 n. 7, 103 S.Ct. at 1046 n. 7. As a purchaser of construction services, Boston was essentially participating in the construction labor market. Because the money for the workers was coming indirectly from the Boston treasury, the city was allowed to favor its own citizens without running afoul of the dormant Commerce Clause.
 
 
 35
 One year later, the Supreme Court rejected Alaska's invocation of the market participant doctrine in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (plurality opinion with respect to market participant question). Alaska had instituted a program of selling timber at a significantly reduced price from state-owned forests only on the condition that buyers agree to process that timber at in-state facilities prior to export. The Court held that "although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant." Id. at 98, 104 S.Ct. at 2245. As the Court pointed out, a private seller of goods has no proprietary interest in what the buyer later does with those goods when the seller is not a participant in a downstream market. See id. at 96, 104 S.Ct. at 2245. Inasmuch as Alaska retained no proprietary interest in the timber after the point of sale, the state could not be considered a participant in the downstream processing market. Unlike the programs at issue in Alexandria Scrap, Reeves, and White, Alaska's timber sales did not involve the direct expenditure of state funds. Instead, the state was trying to coerce private parties to use their own money to patronize local industries.
 
 B. Smithtown's Flow Control Ordinance
 1. Market Participation
 
 36
 Before determining whether Smithtown's flow control ordinance constitutes discriminatory or burdensome regulation of interstate commerce, we must first answer a threshold question: Is the ordinance a "regulation" at all, or does it merely constitute "participation" by Smithtown in the local waste disposal market?[20]
 
 
 37
 SSC argues that Smithtown's flow control ordinance cannot be considered municipal "participation" in the waste disposal market because the ordinance constitutes an exercise of the town's "sovereign powers of civil and criminal enforcement." Smithtown responds, first, that it is generally a "participant" in the waste disposal market because it has placed substantial public funds at risk by assuming extensive financial obligations in connection with the Huntington incinerator. The town further contends that the flow control ordinance is valid under the market participant exception because it protects the town's financial investment in the incinerator. We agree with SSC.
 
 
 38
 To the extent that the flow control ordinance threatens garbage haulers with criminal fines and jail terms if they fail to do business with Smithtown at the Huntington incinerator, the town is engaging in market regulation, not market participation. See Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 48 F.3d 701, 717 (3d Cir.1995) (rejecting argument that flow control ordinance constituted market participation where county purchased landfill services for resale and required garbage haulers to buy those services from county). No private company in the open market could force others to buy its services under pain of criminal penalties. See Washington State Bldg. & Constr. Trades v. Spellman, 684 F.2d 627, 631 (9th Cir.1982) (rejecting market participation characterization of program relying on "civil and criminal penalties which only a state and not a mere proprietor can enforce"), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).
 
 
 39
 Smithtown points to language in South-Central Timber stating that although Alaska "may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant," 467 U.S. at 98, 104 S.Ct. at 2245 (emphasis added). According to Smithtown, the Court was suggesting that Alaska's local processing requirements would have been exempt from Commerce Clause scrutiny if the state had somehow participated in the processing market--for example, by owning a few timber mills. This argument is refuted by Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), where the Court struck down an Oklahoma statute requiring all in-state electrical utilities (both private and public) to use at least ten percent Oklahoma-mined coal to fuel their power plants. The Court acknowledged that with respect to state-owned utilities, Oklahoma was participating as a purchaser in the coal market and therefore could decide to purchase only local coal. But simply because Oklahoma was in one respect a "participant" in the coal market did not mean that in all respects its activity affecting the coal market constituted "market participation." A state's actions constitute "market participation" only if a private party could have engaged in the same actions. For this reason, the Court invalidated as "regulation" Oklahoma's imposition of a local-purchasing requirement on private market participants, even though it found the state otherwise to be a "participant" in the local coal market.
 
 
 40
 Smithtown also draws our attention to City of Philadelphia, 437 U.S. at 627 n. 6, 98 S.Ct. at 2537 n. 6, where the Supreme Court reserved decision as to whether operation of a landfill by a government would constitute market participation. In Swin Resource Systems, Inc. v. Lycoming County, 883 F.2d 245, 250 (3d Cir.1989), cert. denied, 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990), the Court of Appeals answered that question in the affirmative, holding that a local government operating a landfill was a market participant and could charge a lower fee for the disposal of locally generated waste. Smithtown argues that the Huntington incinerator, like the county landfill in Swin, is essentially a "municipal facility" that should qualify as "market participation" by the town. If Smithtown merely used favorable rates to entice town residents to use the local incinerator, it would be acting as a market participant as in Swin. The difference between the Smithtown ordinance and the arrangement challenged in Swin, however, is that Smithtown has established criminal penalties that effectively compel parties to buy services there. We agree with the Third Circuit that
 
 
 41
 [w]hen a public entity participates in a market, it may sell and buy what it chooses, to or from whom it chooses, on terms of its choice; its market participation does not, however, confer upon it the right to use its regulatory power to control the actions of others in that market.
 
 
 42
 Atlantic Coast, 48 F.3d at 717. Thus, we conclude that Smithtown's flow control ordinance constitutes a "regulation" of the waste disposal market, rather than participation in that market. Hence, the ordinance is subject to Commerce Clause scrutiny. White, 460 U.S. at 210, 103 S.Ct. at 1046 ("Impact on out-of-state residents figures into the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause.").
 
 2. Commerce Clause Analysis
 
 43
 Our finding that the market participant exception does not apply to Smithtown's flow control ordinance compels us to turn to the question of whether the ordinance violates the Commerce Clause. Our analysis is governed by the recent case of C & A Carbone v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), where the Supreme Court invoked the antidiscrimination principle of Commerce Clause jurisprudence to strike down a flow control ordinance enacted by Clarkstown, a community similar to Smithtown. Like Smithtown, Clarkstown had been experimenting with ways to ensure a cheap, reliable, and environmentally sound method of disposing of town garbage. Under pressure from state environmental agencies, Clarkstown agreed to close its old landfill and replace it with a new solid waste transfer station. The Court described Clarkstown's solution as follows:
 
 
 44
 The cost of building the transfer station was estimated at $1.4 million. A local private contractor agreed to construct the facility and operate it for five years, after which the town would buy it for one dollar. During those five years, the town guaranteed a minimum waste flow of 120,000 tons per year, for which the contractor could charge the hauler a so-called tipping fee of $81 per ton. If the station received less than 120,000 tons in a year, the town promised to make up the tipping fee deficit. The object of this arrangement was to amortize the cost of the transfer station: The town would finance its new facility with the income generated by the tipping fees.
 
 
 45
 The problem, of course, was how to meet the yearly guarantee. This difficulty was compounded by the fact that the tipping fee of $81 per ton exceeded the disposal cost of unsorted solid waste on the private market. The solution the town adopted was [a] flow control ordinance.... requir[ing] all nonhazardous solid waste within the town to be deposited at the [new] transfer station.... Noncompliance is punishable by as much as a $1,000 fine and up to 15 days in jail.
 
 
 46
 Id. at ----, 114 S.Ct. at 1680. After passage of the flow control ordinance, Carbone continued to ship solid waste to out-of-town transfer stations that charged lower tipping fees. Clarkstown sought a court order forcing Carbone to bring its garbage to the town's preferred transfer station.
 
 
 47
 The Supreme Court held that Clarkstown's flow control ordinance violated the dormant Commerce Clause. In the Court's view, the ordinance discriminated against interstate commerce in that it was "just one more instance of local processing requirements" that are prohibited by the Commerce Clause. Id. at ----, 114 S.Ct. at 1682. The problem, the Court said, was that the ordinance hoarded a local resource--the demand for processing solid waste--for the benefit of a single local business. Id. at ----, ----, 114 S.Ct. at 1682, 1683. It made no difference that Clarkstown discriminated equally against out-of-state and in-state businesses in favoring a single local processor. In the Court's opinion, this only made "the protectionist effect of the ordinance more acute." Id. at ----, 114 S.Ct. at 1683. Because the Court found that the ordinance facially discriminated against interstate commerce, it subjected the Clarkstown ordinance to heightened scrutiny. "Discrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Id.; see also City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535 ("[W]here simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.").
 
 
 48
 That the flow control ordinance was at bottom a financing measure, aimed at ensuring the viability of the new transfer station, did not excuse its discriminatory effect on interstate commerce. The Court stated that
 
 
 49
 revenue generation is not a local interest that can justify discrimination against interstate commerce. Otherwise States could impose discriminatory taxes against solid waste originating outside the State.
 
 
 50
 Clarkstown maintains that special financing is necessary to ensure the long-term survival of the designated facility. If so, the town may subsidize the facility through general taxes or municipal bonds. But having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State.
 
 
 51
 Carbone, --- U.S. at ----, 114 S.Ct. at 1684 (citations omitted).
 
 
 52
 Carbone compels us to find that Smithtown's flow control ordinance facially discriminates against interstate commerce because it directs all town waste to a single local disposal facility, to the exclusion of both in-state and out-of-state competitors. Accordingly, Smithtown must "demonstrate, under rigorous scrutiny, that it has no other means [than its flow control ordinance] to advance a legitimate local interest." Id. at ----, 114 S.Ct. at 1683. In Carbone, Clarkstown's interest in ensuring safe, clean processing of town waste was insufficient to justify its flow control ordinance, since the town could have achieved the same result by enacting uniform health and safety regulations. Id. at ----, 114 S.Ct. at 1683. Likewise, the town could have achieved its goal of ensuring the financial viability of the local transfer station through general taxes or municipal bonds. Id. at ----, 114 S.Ct. at 1684. Because all of these options (and others) are open to Smithtown, its flow control ordinance cannot survive the "rigorous scrutiny" standard mandated by Carbone. We therefore find that the ordinance violates the dormant Commerce Clause.
 
 C. Smithtown's Improvement Contract
 
 53
 Smithtown's improvement contract with SSC stands on more solid ground than does its flow control ordinance, inasmuch as we find that the contract constitutes market participation, rather than regulation. The central question in determining whether the contract constitutes "market participation" by Smithtown is whether it more closely resembles Boston's local-hiring requirements in White, or Alaska's local-processing requirements in South-Central Timber. In both cases, the government reached beyond "the boundary of formal privity of contract" to influence the economic relationships between its trading partners and other parties. See South-Central Timber, 467 U.S. at 96, 104 S.Ct. at 2245; White, 460 U.S. at 211, 103 S.Ct. at 1046. Smithtown has done the same thing by contractually obligating SSC to do business at the Huntington incinerator. SSC argues that this violates the Commerce Clause because Smithtown, like Alaska in South-Central Timber, is flexing its economic muscle in the waste collection market to regulate the downstream market of waste disposal. We disagree.
 
 
 54
 Smithtown is a "major participant" in two "discrete, identifiable class[es] of economic activity": waste collection and waste disposal. See White, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. When town garbage is picked up at the curb, and town garbage is burned to ash in the incinerator, Smithtown is "substantial[ly] if informal[ly]" receiving garbage collection and disposal services--services for which it has chosen to "contract out" rather than to perform itself with town employees and town equipment. Id. Smithtown is spending tax dollars to pay for both of these services, just as Boston was spending tax dollars to pay the salaries of its contractors' construction workers in White. "Insofar as the city expended only its own funds in entering into [waste disposal] contracts for public projects, it [is] a market participant...." Id. at 214-15, 103 S.Ct. at 1048.
 
 
 55
 If Boston could require contractors for city-funded projects to hire a certain percentage of city residents, then Smithtown can require SSC to hire town residents to drive its garbage trucks--since those truck drivers would be "in a substantial if informal sense, 'working for the city.' " Id. at 211 n. 7, 103 S.Ct. at 1046 n. 7. And if Smithtown can require SSC to hire local truck drivers, then it can require the hauler to use local incinerating services as well. It makes no difference in our estimation whether those services are provided by a private company like Ogden, or by a public entity like Smithtown. Because the waste disposal services are "substantial[ly] if informal[ly]" being provided to Smithtown, the town can decide with whom it will deal.
 
 
 56
 The itemization of "disposal" and "collection" charges on SSC's bid for the improvement contract reinforces our conclusion that Smithtown is a buyer, rather than a regulator, of disposal services, the ordinance and its criminal penalties notwithstanding. Because Smithtown pays the disposal portion of the bid to reimburse SSC for tipping fees at the Huntington incinerator, the disposal costs are "passed through" SSC to town residents--who ultimately foot the bill for disposal through user fees assessed on their annual property tax bill.
 
 
 57
 There are four principal reasons why Smithtown charges SSC tipping fees at the incinerator and then reimburses SSC for those charges, instead of charging no tipping fees at the incinerator and simply keeping the taxpayers' user fees in the first place. First, and most important, Smithtown's tipping fees combat the free-rider problem (or free-dumper problem, as it were), by discouraging SSC and the other contract haulers from insinuating out-of-town garbage into the waste they bring to the Huntington incinerator. Second, by charging haulers $65 to dump a ton of garbage, but nothing to dump recyclables, Smithtown encourages its waste haulers to abide by their contractual obligation to separate recyclables from the waste stream. Third, the pass-through mechanism encourages bidders to forecast accurately the amount of waste generated in each improvement district, and not to "low-ball" their estimates to win the contract. If each bid area in the district generates less waste than contemplated by the prevailing estimate, the contractor keeps the difference between the bid and the actual disposal costs. If the area generates more garbage than expected, the hauler must still pay the tipping fees and absorb the excess. Fourth, by itemizing the disposal costs in the contract, Smithtown can easily adjust its charges to town residents in the event of a change in tipping fees. Thus, the principal purpose of the pass-through mechanism is to minimize the town's costs of monitoring SSC's performance under the contract. That SSC pays tipping fees to use the incinerator does not detract from the reality that Smithtown is the one consuming--and ultimately paying for--those disposal services.
 
 
 58
 SSC directs our attention to Waste Recycling v. Southeast Alabama Solid Waste Disposal Authority, 814 F.Supp. 1566, 1570, 1575-77 (M.D.Ala.1993), aff'd sub nom. Waste Recycling v. SE Al Solid, 29 F.3d 641 (11th Cir.1994), where the court rejected application of the market participant doctrine to a garbage collection and disposal contract much like the one between Smithtown and SSC. An ordinance passed by the town of Geneva, Mississippi, vested in the town title to all locally generated waste, and prohibited private garbage collectors from contracting directly with generators of solid waste. The court refused to characterize the contract as market participation, on the theory that the town was not motivated purely by profit-making concerns, id. at 1573, and that it had no true proprietary interest in the garbage, id. at 1576.
 
 
 59
 We decline to adopt the reasoning of the Waste Recycling court. First, it is well established that a protectionist motive does not automatically render state activity "regulation." As the Supreme Court stated in Reeves:
 
 
 60
 We find the label "protectionism" of little help in this context. The State's refusal to sell to buyers other than South Dakotans is "protectionist" only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve. Petitioner's argument apparently also would characterize as "protectionist" rules restricting to state residents the enjoyment of state educational institutions, energy generated by a state-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps "protectionist" in a loose sense, reflect the essential and patently unobjectionable purpose of state government--to serve the citizens of the State.
 
 
 61
 447 U.S. at 442, 100 S.Ct. at 2280. In the three cases where the Supreme Court found that a state or city engaged in market participation, the government's motive in enacting the challenged legislation was admittedly not to maximize its own profits as a private company would. Rather, Boston sought to stimulate local employment in White; South Dakota sought to provide cheap products for state residents in Reeves; and Maryland aimed to abate a public nuisance in Alexandria Scrap.
 
 
 62
 Second, a town need not possess a proprietary interest in the garbage itself in order to place contractual restrictions on its disposal. As the Supreme Court observed in Carbone, the article of commerce is not merely the physical trash sitting in barrels or dumpsters, but also the demand for garbage processing and disposal services. Carbone, --- U.S. at ----, 114 S.Ct. at 1682. As discussed earlier, Smithtown has a very real interest in both the collection and disposal services, since it pays for both. If the town wished, it could perform these traditional municipal services itself (with public employees), or it could contract for each service separately. When the town buys the two in a bundle, it participates in the waste disposal market just as directly as--indeed, even more directly than--Boston participated in the labor market in White.
 
 
 63
 Our conclusion that Smithtown has an identifiable interest in the disposal of its garbage is reinforced by the towns' vulnerability to liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. Sec. 9607(a) (1988), if they "arrange" for the disposal and treatment of municipal solid waste. B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1199 (2d Cir.1992) (holding municipalities subject to "arranger" liability under CERCLA). If Smithtown could not contractually designate where its waste should be disposed, it would be powerless to stave off future CERCLA liability. Because the specter of CERCLA liability is intended to encourage "arrangers" of waste disposal to select environmentally secure disposal sites, Congress clearly contemplated that towns would have some voice as to the selection of those sites.
 
 
 64
 That Smithtown has favored itself, rather than some private company, as the provider of disposal services does not affect our analysis. As discussed earlier, it is true that Smithtown "participates" in the waste disposal market not only as a buyer of disposal services from SSC, but also as a buyer of services from Ogden and a re-seller of those services to SSC. But while these latter two forms of doing business may constitute "market participation" on the part of Smithtown, they do not necessarily determine whether another town action--buying disposal services through the improvement contract--also constitutes market participation. Smithtown could not force SSC or anyone else to do business with the town as a seller of disposal services at the Huntington incinerator, without resorting to its police powers--and thereby acting as a market regulator. But because Smithtown is substantially the buyer (and consumer) of those services, it can dictate by contract where SSC must purchase the waste disposal services provided to the town.
 
 
 65
 Finally, we address SSC's contention that Smithtown should not be considered a market participant, on the theory that such a characterization would subject the town to the antitrust laws. The logic of this argument escapes us. First, it is far from clear that treating Smithtown as a "market participant" for Commerce Clause purposes necessarily subjects it to the antitrust laws. As the Supreme Court held in City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 413, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978) (plurality opinion), the antitrust laws do not prohibit local governments from engaging in anticompetitive conduct "pursuant to state policy to displace competition with regulation or monopoly public service." See also Community Communications Co. v. City of Boulder, 455 U.S. 40, 54, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982) (holding that municipalities are entitled to antitrust immunity "to the extent that they acted pursuant to a clearly articulated and affirmatively expressed state policy"). Smithtown's efforts to guarantee business for the Huntington incinerator have been actively encouraged by the State of New York, through its legislature, and thus would seem to enjoy antitrust immunity.[21] See Hybud Equip. Corp. v. City of Akron, 742 F.2d 949, 956 (6th Cir.1984), cert. denied, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985) (applying City of Lafayette to find antitrust immunity for municipal solid waste services monopoly created pursuant to "clearly articulated and affirmatively expressed policy"); Central Iowa Refuse Sys., Inc. v. Des Moines Metro. Solid Waste Agency, 715 F.2d 419 (8th Cir.1983), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985) (same); Seay Bros. v. Albuquerque, 601 F.Supp. 1518 (D.N.M.1985) (finding antitrust immunity for city that implemented and supervised operation of refuse disposal monopoly); Savage v. Waste Management, Inc., 623 F.Supp. 1505 (D.S.C.1985) (finding antitrust immunity for county that gave exclusive franchise for garbage collection and disposal); Tri-State Rubbish, Inc. v. Waste Management, Inc., 803 F.Supp. 451 (D.Me.1992) (upholding municipal flow control ordinance against antitrust claims). But see City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 378, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382 (1991) ("We reiterate that, with the possible market participant exception, any action that qualifies as state action is 'ipso facto ... exempt from operation of the antitrust laws.' " (quoting Hoover v. Ronwin, 466 U.S. 558, 580, 104 S.Ct. 1989, 2001, 80 L.Ed.2d 590 (1984))); Jefferson County Pharmaceutical Ass'n v. Abbott Lab., 460 U.S. 150, 154, 103 S.Ct. 1011, 1015, 74 L.Ed.2d 882 (1983) (holding that states are subject to Robinson-Patman Act if they compete in the private retail market).
 
 
 66
 Second, and more important, it is unclear why this court should use the antitrust statutes--which are subject to legislative change--to guide our interpretation of the word "regulation" as defined in the Constitution. It is axiomatic that we prefer constructions of ordinances and statutes that do not conflict with the Constitution. Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("[W]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). SSC would have us engage in a sort of reverse-Ashwander analysis and construe Smithtown's activity as violating the Commerce Clause rather than the antitrust laws. We decline the invitation to stand Ashwander on its head, and we adhere to our interpretation of the Commerce Clause.
 
 III. CONCLUSION
 To summarize:
 
 67
 1. Smithtown's flow control ordinance, which is enforceable through criminal penalties, constitutes market regulation rather than market participation. The ordinance is indistinguishable from the one struck down by the Supreme Court in Carbone, and thus violates the dormant Commerce Clause.
 
 
 68
 2. The improvement contract constitutes municipal participation in both the waste collection and disposal markets, and thus does not violate the Commerce Clause.
 
 
 69
 The judgment is accordingly affirmed in part and reversed in part.
 
 
 
 [1]
 See, e.g., Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964) (invalidating Florida regulation reserving to local producers a substantial share of local milk market); Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (striking down city ordinance forbidding sale of milk unless bottled and pasteurized within five miles of city center); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (invalidating New York's refusal to permit Massachusetts milk distributor to build additional purchasing center in New York, which would divert locally produced milk to out-of-state markets); Milk Control Bd. v. Eisenberg Farm Prods., 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939) (upholding Pennsylvania statute establishing minimum prices to be paid to in-state dairy farmers, on grounds that effect on interstate commerce was incidental); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (striking down New York statute setting minimum price for milk dealers to pay to in- or out-of-state dairy farmers); Schollenberger v. Pennsylvania, 171 U.S. 1, 18 S.Ct. 757, 43 L.Ed. 49 (1898) (invalidating Pennsylvania statute banning importation of oleomargarine--a butter substitute--for sale); see also Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (upholding New York milk price controls against due process and equal protection challenges). More recent cases include West Lynn Creamery, Inc. v. Healy, --- U.S. ----, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (invalidating Massachusetts program assessing nondiscriminatory tax on all milk sold in state, but using proceeds of that tax to subsidize only in-state dairy farmers), id. at ---- n. 22, 114 S.Ct. at 2218 n. 22 (commenting on "the surprisingly large number" of cases involving dairy farmers in Commerce Clause jurisprudence), and Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976) (striking down Mississippi regulation permitting out-of-state milk to be sold in Mississippi only if the state of origin accepted Mississippi milk on a reciprocal basis)
 The nexus between milk and garbage is significant, but often overlooked. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (rejecting Commerce Clause challenge to Minnesota statute prohibiting distribution of milk in nonrecyclable, nonreturnable plastic containers).
 
 
 [2]
 C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); Oregon Waste Sys., Inc. v. Department of Envtl. Quality, --- U.S. ----, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); Fort Gratiot Landfill v. Michigan Dep't of Natural Resources, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); Chemical Waste Management Inc. v. Hunt, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); New York v. United States, 505 U.S 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that Congress may not compel states to enact legislation through coercive "take title" provisions regarding hazardous waste); City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)
 
 
 [3]
 See Carbone, --- U.S. at ----, 114 S.Ct. at 1693 (Souter, J., dissenting)
 
 
 [4]
 See, e.g., Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. Secs. 9601-9657 (1988 & Supp. V 1993)
 
 
 [5]
 "Sometimes referred to as a gate fee or disposal charge, the term 'tipping fee' is derived from the fact that trucks delivering waste must 'tip' the back-end of the truck to drop off the waste." Eric S. Petersen & David N. Abramowitz, Municipal Solid Waste Flow Control in the Post-Carbone World, 22 FORDHAM URB. L.J. 361, 369 n. 46 (1995)
 
 
 [6]
 The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, Sec. 8, cl. 3. The term "dormant" Commerce Clause refers to the negative implications of that constitutional provision, which limit the authority of state and local governments that either discriminate against, or unduly burden, interstate commerce. Oklahoma Tax Comm'n v. Jefferson Lines, Inc., --- U.S. ----, ----, 115 S.Ct. 1331, 1335, 131 L.Ed.2d 261 (1995)
 
 
 [7]
 The Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub.L. No. 94-580 (codified at 42 U.S.C. Secs. 6901-6902), for example, required states receiving federal financial assistance under the Act to "prohibit the establishment of new open dumps" and to require all solid waste to be either "utilized for resource recovery" or "disposed of in sanitary landfills" that satisfy standards promulgated by the U.S. Environmental Protection Agency. 42 U.S.C. Sec. 6943(a)(2) (1988). The legislation provides some leeway for a state to upgrade its open dumps to sanitary landfills, provided that it establish an approved timetable for compliance. Id. Sec. 6945. Pursuant to RCRA, the EPA has promulgated minimum national criteria for municipal solid waste landfills in Part 258 of 40 C.F.R. (1994)
 
 
 [8]
 The Long Island Landfill Law, 1983 N.Y.Laws 299 (codified at N.Y. ENVTL.CONSERV.LAW Sec. 27-0704 (McKinney 1984)), phased out the practice of landfilling raw garbage, prohibited development of new landfills in deep flow groundwater recharge zones, and designated resource recovery, incineration, or composting as the preferred alternatives for disposal of municipal solid waste on Long Island
 
 
 [9]
 In December 1989, the towns of Smithtown and Huntington executed a Municipal Cooperation Agreement under Article 5G of the General Municipal Law of the State of New York. See N.Y.GEN.MUN.LAW Secs. 119-m to -oo (McKinney 1986 & Supp.1994). Under this agreement, the two towns assumed joint responsibility for the obligations originally incurred by Huntington in its Service Agreement with the operator of the incinerator, and in related agreements with the New York State Environmental Facilities Corporation and the State of New York, both of which contributed grant funds to the project. The towns also agreed to share certain obligations incurred by Smithtown to expand its existing landfill. Each town is entitled to equal access and use of both the Huntington incinerator and the Smithtown landfill under the municipal agreement
 
 
 [10]
 Ogden is a Delaware corporation that formed a Delaware limited partnership, C-E Huntington L.P., as a special subsidiary to construct and operate the Huntington incinerator
 
 
 [11]
 The town code defines "acceptable waste" as
 Only solid waste acceptable at specific town-designated facilities, including but not limited to garbage, trash, rubbish, refuse, construction and demolition materials and yard waste that are normally disposed of by and collected from residential, commercial, industrial, governmental, community facilities or institutional establishments, except that "acceptable wastes" shall not include unacceptable waste and recyclables.
 SMITHTOWN CODE Sec. 177-4 (1994). "Unacceptable waste" and "recyclables" are defined elsewhere in the town code.
 
 
 [12]
 For convenience, this opinion will use the terms "garbage" and "acceptable waste" interchangeably
 
 
 [13]
 The improvement districts include all residences in Smithtown, except for those in three incorporated villages
 
 
 [14]
 "It is the responsibility of ... each Prospective Bidder to determine to their own satisfaction, the quantity of Residential Solid Waste to be generated in each Contract Bid Area and to include the costs for disposal of the residential solid waste, at the prescribed tipping fees, in the Itemized Bid Proposal." Sec. 1.07(A)(2), Contract
 
 
 [15]
 SSC collects residential garbage in Smithtown pursuant to the Improvement contract, and commercial garbage pursuant to private agreements with various Smithtown businesses. SSC has not challenged Smithtown's authority to create improvement districts for the collection of residential garbage, or to contract with a private company to collect that garbage. Instead, the plaintiff garbage hauler only contests Smithtown's right to include in the contract the requirement that SSC bring its garbage to a designated waste disposal facility
 
 
 [16]
 See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (rejecting Commerce Clause challenge to Congress's enactment of employment regulations applicable to the states). There are, however, some limits to this power. See United States v. Lopez, --- U.S. ----, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (invalidating federal statute that criminalizes possession of firearms within school zones, as exceeding Congress's power to regulate interstate commerce)
 
 
 [17]
 See, e.g., Tyler Pipe Indus. v. Washington State Dep't of Revenue, 483 U.S. 232, 259-65, 107 S.Ct. 2810, 2826-29, 97 L.Ed.2d 199 (1987) (Scalia, J., concurring in part and dissenting in part) (arguing that Framers did not intend "negative" or "dormant" component of Commerce Clause); Itel Containers Int'l Corp. v. Huddleston, --- U.S. ----, ----, 113 S.Ct. 1095, 1106, 122 L.Ed.2d 421 (1993) (Scalia, J., concurring in part and concurring in the judgment) (concurring in enforcement of dormant Commerce Clause on stare decisis grounds); FELIX FRANKFURTER, THE COMMERCE CLAUSE UNDER MARSHALL, TANEY AND WAITE 12 (1937) (describing absence of comment during drafting and ratification of Constitution regarding possible negative implications of Commerce Clause); Albert S. Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 MINN.L.REV. 432, 493 (1941) (arguing that historical evidence "supports the view that, as to the restricted field which was deemed at the time to constitute regulation of commerce, the grant of power to the federal government presupposed the withdrawal of authority pari passu from the states.")
 
 
 [18]
 The "market participant" doctrine applies to local as well as state governments. See White v. Massachusetts Council of Constr. Employers, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (finding that city of Boston is market participant). Because the Commerce Clause only governs the category of activity known as "market regulation," the determination that an actor is "participating" in the market places that activity outside the purview of Commerce Clause restrictions, whatever the identity of the actor. This differs from Eleventh Amendment doctrine, for example, where the states, but not local governments, enjoy immunity from suit in federal court. See Monell v. Department of Social Servs., 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978)
 
 
 [19]
 The Court ultimately struck down the Oklahoma statute because it also applied to privately owned power plants. 502 U.S. at 454-59, 112 S.Ct. at 800-02
 
 
 [20]
 We note preliminarily that the market participant doctrine was not mentioned in any of the several opinions in Carbone. Although in his dissent Justice Souter contended that the Clarkstown transfer station was "essentially a municipal facility," --- U.S. at ----, 114 S.Ct. at 1696, he did not argue that the town's favoritism of the transfer station therefore constituted participation in the waste disposal market that was exempt from Commerce Clause analysis
 
 
 [21]
 The New York State Legislature passed legislation specifically authorizing Smithtown to adopt ordinances
 imposing appropriate and reasonable limitations on competition with respect to collecting, receiving, transporting, delivering, storing, processing and disposing of solid waste or the recovery by any means of any material or energy product or resource therefrom, including local laws requiring that all solid waste generated, originated or brought within its boundaries, subject to such exceptions as may be determined to be in the public interest, shall be delivered to a specified solid waste management-resource recovery facility....
 N.Y.GEN.MUN.LAW Sec. 120-bb(4) (McKinney Supp.1994). The same statute specifically authorizes the Municipal Agreement between Huntington and Smithtown. Id. Sec. 120-bb(1)-(3), (5)-(7). Finally, the Legislature specifically approved the cooperative venture between Smithtown and Huntington in legislative findings in 1989 N.Y.Laws 80. The Legislature found that
 the proper management of solid waste is often most economically and efficiently achieved by the cooperative regional development by municipalities of facilities designed to address their mutual disposal needs and that it is in the public interest to encourage such cooperation and that such cooperative development is consistent with the state's solid waste management policy.
 The legislature further finds and declares that the towns of Huntington and Smithtown have demonstrated the value of such cooperation and have moved forward to reduce, reuse and recycle solid waste pursuant to the statutory hierarchy established under the Solid Waste Management Act of 1988.
 Smithtown's project also met with the approval of the state bonding authority, which lent funds to construct the incinerator. Any lingering doubt as to whether the State of New York approves of Smithtown's activities should be put to rest by the state's filing of an amicus brief in this case supporting Smithtown.