**HOULTON CITIZENS' COALITION, et al., Plaintiffs, Appellants,**

v.

**TOWN OF HOULTON, Defendant, Appellee.**

No. 98–1999.

United States Court of Appeals, First Circuit.

Heard Feb. 2, 1999.

Decided April 22, 1999.

Robert M. Morris, with whom Steven R. Davis and Carton, Davis & Morris, P.A. were on brief, for appellants.

Michael E. Saucier, with whom Thompson & Bowie was on brief, for appellee.

Before SELYA, STAHL and LIPEZ, Circuit Judges.

SELYA, Circuit Judge.

This litigation has its genesis in a waste management scheme devised by the town fathers of Houlton, Maine (the Town). The appellants claim that Houlton's plan—under which the Town by contract designated a single firm as the exclusive hauler of residential waste within its borders, and enacted a flow-control ordinance directing all such waste either to be collected by that firm or to be brought to its transfer station—violates the Commerce Clause, the Takings Clause, the Contract Clause, and the town charter. The district court rejected these importunings. We affirm the judgment below (with a slight modification), but our reasoning differs from the

district court's in respect to the principal bone of contention—the Commerce Clause challenge.

## I. BACKGROUND

As in many small towns across the nation, Houlton residents traditionally dealt with solid waste by depositing it in the town dump or engaging others to do so. On October 17, 1995, state environmental authorities closed the dump. In order to remain compliant with state law, the Town needed to fashion a new way for its residents to deal with solid waste. It thereupon issued a request for proposals (RFP), conducted an open competitive bidding process that resulted in the selection of a local firm (Andino, Inc.) as its exclusive contractor, agreed to provide that firm with a guaranteed trash quota for seven years, and enacted a flow-control ordinance (the 1995 Ordinance) that required all residential solid waste generated within the town limits to be taken to a local transfer site operated by Andino.

In New England, change does not come easily. Asserting that the 1995 Ordinance violated the Commerce Clause, David Condon, a trash disposal operator, sued Andino and the Town. The federal district court preliminarily enjoined enforcement of the 1995 Ordinance, see Condon v. Andino, Inc., 961 F.Supp. 323, 331–32 (D.Me.1997), and the Town folded; instead of litigating to the bitter end, it revised the law and enacted a new ordinance (the 1997 Ordinance) that put a somewhat different waste management system into effect.

The new plan has two components. The first is the 1997 Ordinance itself. The ordinance requires all generators of residential rubbish within the Town either to use Houlton's chosen contractor to transport their trash, or to haul it themselves. See 1997 Ordinance § 10–507. Although the Town's contractor is permitted to dispose of collected trash at any proper disposal site, residents who choose to self-haul are required to take their refuse to a repository designated by the Town Coun-

cil. *See id.* § 10–504. The ordinance provides fines and other penalties for noncompliance. *See id.* § 10–503.

The contract between Andino and the Town constitutes the new scheme's second component. The previous contract between these parties had included, *inter alia,* a failsafe clause whereby the Town agreed to negotiate with Andino in good faith to keep it as the Town's contractor if a court of competent jurisdiction held the 1995 Ordinance invalid or unenforceable. Purporting to honor its commitment to renegotiate, the Town implemented the 1997 Ordinance by supplementing and amending the preexisting contract, granting Andino the exclusive right to collect third-party residential waste under the 1997 Ordinance, and designating its transfer station as the disposal site for self-haulers.

These modifications did not placate those who yearned for simpler times. Four plaintiffs combined to sue the Town in federal district court. They included Condon, two other local trash haulers (William Faulkner and Fred Spellman), and the Houlton Citizens' Coalition (HCC), an unincorporated nonprofit association formed by Houlton residents. Invoking federal question jurisdiction, 28 U.S.C. § 1331—there is no other readily apparent jurisdictional basis—the plaintiffs challenged the 1997 Ordinance under, *inter alia,* the Commerce Clause, the Takings Clause, and the Contract Clause. They also appended a supplemental state-law claim under the town charter. The district court rebuffed their attempt to restrain implementation of the 1997 Ordinance *pendente lite,* concluding that the plaintiffs were unlikely to prevail on the merits. *See Houlton Citizens' Coalition v. Town of Houlton,* 982 F.Supp. 40, 46 (D.Me.1997) (*HCC I*). The court subsequently granted summary judgment for the Town on the four claims with which we are concerned.

1. Prior to oral argument in this court, Condon and Spellman withdrew as appellants.

*See Houlton Citizens' Coalition v. Town of Houlton,* 11 F.Supp.2d 105, 112 (D.Me. 1998) (*HCC II*). This appeal followed.[1]

## II. STANDING

Before we consider the appellants' substantive arguments, we pause to ponder a potential problem: the claim that the Coalition, an unincorporated nonprofit association that was formed, according to the uncontradicted affidavit of its president, specifically "to provide a forum for research, analysis, discussion and public education of civic policy issues related to the public administration of the Town of Houlton, Maine" and "to perform civic public service in this role," lacks standing. *See United States v. AVX Corp.,* 962 F.2d 108, 113–16 (1st Cir.1992) (discussing elements of standing requirement for unincorporated associations).

The Town brings some heavy artillery to this battlefield. Two respected courts recently have held that individual garbage generators lacked standing to challenge schemes similar to Houlton's under the Commerce Clause. *See Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County,* 115 F.3d 1372, 1381–82 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 629, 139 L.Ed.2d 609 (1997); *Individuals for Responsible Gov't, Inc. v. Washoe County,* 110 F.3d 699, 703–04 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 411, 139 L.Ed.2d 315 (1997). These courts emphasized that the purpose of the dormant Commerce Clause is to curtail states' abilities to hinder interstate trade, and that the injury claimed by the individual garbage generators—being compelled to pay higher prices for services they neither required nor desired—was not even marginally related to this purpose. *See Ben Oehrleins,* 115 F.3d at 1382; *Washoe County,* 110 F.3d at 703.

Faulkner and HCC press on with the appeal.

The HCC shares many attributes with the parties found to lack standing in *Ben Oehrleins* and *Washoe County*. It is made up of individual trash generators who complain that under the 1997 Ordinance they will be forced to contract with Andino, when previously they could patronize other haulers (presumably at lower prices or on more felicitous terms). Despite this parallelism, however, we need not decide whether we share the outlook of the *Ben Oehrleins* and *Washoe County* courts. It is a settled principle that when one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of the others. *See Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 2100 n. 19, 141 L.Ed.2d 393 (1998); *Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 976 (1st Cir.1989). We take refuge behind this principle today.

Here, Faulkner, a co-plaintiff, satisfies both the constitutional requirements and the prudential conditions for standing. He has lost the business of his residential customers in Houlton; that injury can be traced directly to the Town's neoteric waste management scheme; and the injury would be adequately redressed by equitable relief and/or damages against the Town. As a classic plaintiff asserting his own economic interests under the Commerce Clause—a constitutional provision specifically targeted to protect those interests—Faulkner avoids any concerns relative either to jus tertii, *see Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), or to the zone of interests requirement, *see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

We note, moreover, that Faulkner's claim to standing is not damaged because he failed to allege that he hauled garbage out-of-state or planned to do so. In Commerce Clause jurisprudence, cognizable injury is not restricted to those members of the affected class against whom states or their political subdivisions ultimately discriminate. *See General Motors Corp. v. Tracy*, 519 U.S. 278, 286, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). Thus, an in-state business which meets constitutional and prudential requirements due to the direct or indirect effects of a law purported to violate the dormant Commerce Clause has standing to challenge that law. *See id.* at 286–87, 117 S.Ct. 811 (collecting cases); *see also Ben Oehrleins*, 115 F.3d at 1379 (affirming district court's finding of standing for in-state haulers and landfill operators).

That ends this phase of our inquiry. Because Faulkner has standing to challenge the 1997 Ordinance, we need not decide whether the HCC has standing to mount a challenge in its own right.

## III.  ANALYSIS

The appellants find four fatal flaws in the Town's waste management scheme: (1) it insults the dormant Commerce Clause; (2) it takes private property without just compensation; (3) it impermissibly burdens contracts; and (4) its implementation by the Town violates the municipal charter. Only the first of these contentions demands extended discussion.

The first order of business requires us to remark the underlying legal standard. This appeal emanates from an order granting summary judgment. We have written extensively about that procedural device, *see, e.g., McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314–15 (1st Cir.1995) (collecting cases), and we need only sketch the parameters here.

A district court may enter summary judgment upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In this instance, the district court found that the Town had made

such a showing and granted its motion for *brevis* disposition on all counts. We review orders for summary judgment de novo, considering the record and all reasonable inferences therefrom in the light most hospitable to the summary judgment loser. *See Mullin v. Raytheon Co.*, 164 F.3d 696, 698 (1st Cir.1999). This standard of review permits us to embrace or reject the rationale employed by the lower court and still uphold its order for summary judgment. In other words, we may affirm such an order on any ground revealed by the record. *See Hachikian v. FDIC*, 96 F.3d 502, 504 (1st Cir.1996); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). With this brief preface, we turn to the substance of the appellants' asseverations.

### A. *The Commerce Clause Challenge.*

■ In terms, the Constitution empowers Congress "[t]o regulate Commerce ... among the several states." U.S. Const. art I, § 8, cl. 3. Over time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another. This has come to be known as the "dormant Commerce Clause." The dormant Commerce Clause does not affect state or local regulations directly authorized by Congress, *see Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915, (1945), but, rather, acts as a brake on the states' authority to regulate in areas in which Congress has not affirmatively acted, *see Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). If a state or local government enters such uncharted waters and enacts a law that unduly favors in-state commercial interests over their out-of-state counterparts, that law "routinely" will be defenestrated under the dormant Commerce Clause "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *West Lynn Creamery, Inc. v.*

*Healy*, 512 U.S. 186, 192–93, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

■ The case at hand involves the application of the dormant Commerce Clause to a municipal waste management scheme. While the issue is one of first impression in this circuit, we come upon the scene finding the legal landscape already considerably cluttered. The Supreme Court has dealt with quandaries of this general kind several times in the last decade. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). *Clarkstown* is both the most recent and the most relevant of these precedents, and we use it as a point of departure to put into perspective the precise issue that confronts us.

After the closing of its municipal landfill and the entry of a consent decree with New York's Department of Environmental Conservation, Clarkstown found itself in a situation similar to that of Houlton. *See Clarkstown*, 511 U.S. at 386–87, 114 S.Ct. 1677. In response, the town contracted with a commercial entity to build a transfer station within its borders (the Route 303 station), retaining the right to purchase the transfer station for a nominal sum after five years. *See id.* at 387, 114 S.Ct. 1677. Clarkstown financed construction of the Route 303 station by guaranteeing that a set level of trash would be brought there and establishing above-market "tipping fees" to be paid by garbage disposers. *See id.* In order to ensure the fulfillment of this self-imposed quota, Clarkstown passed a flow-control ordinance directing that all waste within its borders be disposed of at the Route 303 station. *See id.* In defiance of this di-

rective, Carbone (a local trash hauler) transported waste from Clarkstown to out-of-state landfills without passing it through the Route 303 station and without paying tipping fees there. *See id.* at 387–88, 114 S.Ct. 1677. Clarkstown sought an injunction, and Carbone defended on Commerce Clause grounds.

The New York courts ruled that the flow-control ordinance passed constitutional muster. *See Town of Clarkstown v. C & A Carbone, Inc.,* 182 A.D.2d 213, 587 N.Y.S.2d 681, 687–88 (1992), *appeal denied,* 80 N.Y.2d 760, 591 N.Y.S.2d 138, 605 N.E.2d 874 (1992). The United States Supreme Court thought otherwise. It reversed, holding the ordinance unconstitutional. *See Clarkstown,* 511 U.S. at 394–95, 114 S.Ct. 1677. We find the architecture of the Court's dormant Commerce Clause analysis instructive.

The Court first addressed the threshold question of whether the challenged ordinance discriminated on its face against interstate commerce (as opposed to regulating commerce evenhandedly with only incidental effects on interstate commerce). *See id.* at 390, 114 S.Ct. 1677; *id.* at 402, 114 S.Ct. 1677 (O'Connor, J., concurring). It noted that an ordinance that discriminates on its face against interstate commerce and in favor of local businesses is per se invalid, "save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at 392, 114 S.Ct. 1677. The Court further explained that if an ordinance is not discriminatory on its face, a balancing test must then be performed to determine its constitutionality. *See id.* at 390, 114 S.Ct. 1677. Viewed in this less intense light, the ordinance will stand unless the burden that it places upon interstate commerce is "clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

Using these criteria, the Court adjudged Clarkstown's flow-control ordinance discriminatory on its face; the ordinance achieved its goal of providing the refuse necessary to finance the Route 303 station "by depriving competitors, including out-of-state firms, of access to a local market." *Id.* at 386, 114 S.Ct. 1677. For this reason, Justice Kennedy, writing for the majority, classified the ordinance as merely another example of the type of local processing requirement that the Court had invalidated with monotonous regularity, observing that Clarkstown's scheme attempted to hoard solid waste, just as states and municipalities in prior cases had attempted to hoard other commodities for processing by local, as opposed to out-of-state, interests.[2] *See id.* at 391–92, 114 S.Ct. 1677. To illustrate the point, the Court cited, *inter alia,* earlier decisions striking down schemes to "hoard" timber, *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), milk, *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), and meat, *Minnesota v. Barber,* 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455 (1890).

In the jurisprudence of the dormant Commerce Clause, a finding of facial discrimination is almost always fatal. *Clarkstown* proved no exception. Though the municipality's interests in the efficient processing and disposal of solid waste and in financing its transfer station were legitimate concerns, the Court abrogated the flow-control ordinance because those goals could have been pursued through nondiscriminatory alternatives. *See Clarkstown,* 511 U.S. at 393, 114 S.Ct. 1677.

---

**2.** Clarkstown's favoring of a single local processor over all other processors, in-state and out-of-state, "ma[de] the protectionist effect of the ordinance more acute" by "squelch[ing] competition in the waste-processing service altogether, leaving no room for investment from outside." *Clarkstown,* 511 U.S. at 392, 114 S.Ct. 1677.

Our sister circuits have glossed the lessons of *Clarkstown* somewhat differently. In *SSC Corp. v. Town of Smithtown,* 66 F.3d 502 (2d Cir.1995), the Second Circuit considered a binary waste management scheme consisting of (a) a flow-control ordinance that required all municipal waste to be disposed of at a facility designated by the town, *see id.* at 507, and (b) a series of contracts with a discrete group of haulers for particular areas of the town, in which Smithtown granted each hauler an exclusive franchise for a specific area, required disposal at the town's designated site, and financed the hauling contracts through tax assessments, *see id.* at 507–08. The court found the scheme's first facet unconstitutional, believing that *Clarkstown* compelled it to nullify the ordinance "because it directs all town waste to a single local disposal facility, to the exclusion of both in-state and out-of-state competitors." *Id.* at 514. The court nevertheless approved the scheme's second facet, validating the town's use of exclusive hauling contracts under the dormant Commerce Clause's market participant exception. *See id.* at 514–18; *see generally Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (holding that a state or municipality is outside the purview of the dormant Commerce Clause—and thus may tilt in favor of local businesses—when it enters a market as a participant rather than as a regulator).

On the same day it decided *Smithtown,* the Second Circuit also decided *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272 (2d Cir.1995). As part of its solid waste plan, Babylon had entered an exclusive service agreement with a single hauler (BSSCI) to remove all commercial waste and simultaneously had precluded the licensing of other haulers. *See id.* at 1278–79. The town allowed BSSCI to dispose of the trash that it collected without charge at a municipally-owned, but privately-operated, incinerator. *See id.* at 1277–79. Moreover, it paid both BSSCI and the incinerator operator with public funds. *See id.*

The court held that Babylon's scheme did not discriminate on its face against interstate commerce, but merely eliminated the commercial market for garbage collection services, substituting for it the town's provision of those services through a private contractor. *See id.* at 1283. The court also held that Babylon's grant of an exclusive franchise and free disposal rights to its chosen contractor constituted market participation, exempt from the requirements of the dormant Commerce Clause. *See id.* at 1288–89.

In the dim afterlight of *Clarkstown,* another court of appeals has spoken on the subject of flow control and the dormant Commerce Clause. *See Harvey & Harvey, Inc. v. County of Chester,* 68 F.3d 788 (3d Cir.1995). Acting pursuant to state law, the county commissioners of Chester, Pennsylvania, adopted a solid waste plan and a flow-control ordinance. *See id.* at 794. The ordinance created two service areas and required all garbage in each area to go to a designated landfill within that area (save only for a certain amount of waste allocated to a third in-state landfill nearby). *See id.* at 794–95. Harvey & Harvey, Inc., an interstate hauler and processor, challenged the plan under the dormant Commerce Clause. The district court ruled that the plan did not discriminate on its face against interstate commerce and that application of the *Pike* balancing test was warranted. *See id.* at 795. Because Harvey & Harvey conceded that it could not prove its case under that standard, the court entered judgment for the defendant.

On appeal, the Third Circuit acknowledged that, under *Clarkstown,* a flow-control ordinance favoring a single in-state operator over all other in-state and out-of-state operators might be vulnerable to attack under the dormant Commerce Clause. *See id.* at 798. Still, the court observed that not all such ordinances would suffer such a fate. *See id.* Similarly, "[t]hat [an] ordinance requires the use of [a] selected

facility, thus prohibiting the use of non-designated facilities (which may be out of state), does not itself establish a Commerce Clause violation." *Id.* Thus, although the grant of an exclusive contract to a local waste hauler/processor is suspect, it is not a per se violation of the dormant Commerce Clause. *See id.* at 801.

The Third Circuit then explained that, to secure a finding of discrimination vis-à-vis a flow-control scheme that excludes all out-of-state haulers and/or processors and most in-state haulers and/or processors, the challenger must show that those excluded did not have a fair opportunity to obtain the town's custom. If the playing field is level for both in-state and out-of-state bidders, such parity ordinarily will satisfy the constitutional imperative. *See id.* at 802. Under this standard, "a local authority could choose a single provider—without impermissibly discriminating against inter-state commerce—so long as the selection process was open and competitive and offered truly equal opportunities to in- and out-of-state businesses." *Id.* The court of appeals then asked the district court to reconsider Harvey & Harvey's plaint in light of the newly articulated standard. *See id.* at 807.

Against this backdrop, we inquire whether the 1997 Ordinance enacted by the Houlton Town Council discriminates on its face against interstate commerce. Like Clarkstown's ordinance, the challenged ordinance and the contract granted ancillary to it funnel all residential waste through a single contractor. Because of that similarity, the appellants chant the *Clarkstown* catechism, claiming that Houlton's scheme "deprives out-of-state businesses of access to a local market," *Clarkstown,* 511 U.S. at 389, 114 S.Ct. 1677, and thereby "discriminates, for it allows only the favored operator to process waste that is within the limits of the town," *id.* at 391, 114 S.Ct. 1677. Houlton dismisses the analogy to *Clarkstown.* In its view, the more apt analogy is to *Smithtown*'s sec-

ond facet because Houlton, like Smithtown, became the only buyer in the local garbage market by means of the 1997 Ordinance and, acting as a market participant, hired Andino to service its garbage needs. Alternatively, the Town compares its position to Babylon's because it took over the garbage collection market while acting as a regulator, and then privatized its own provision of collection services, acting as a market participant.

This last argument proved persuasive below. Following the *Babylon* court's lead, the district judge considered the two parts of Houlton's waste management scheme separately. Initially, he ruled that the 1997 Ordinance constituted market regulation and, like Babylon's ordinance, served merely to eliminate the private sector from the garbage collection business. *See HCC I,* 982 F.Supp. at 43–44. Still concentrating on the ordinance, the judge noted that Houlton had become "the lone provider of [collection] services and ha[d] hired Andino to furnish these services on its behalf subject to the Town's supervision and control." *Id.* at 45. On this basis, he concluded that the 1997 Ordinance did not facially discriminate against interstate commerce. *See id.* at 46. Finally, he performed the requisite balancing test and declared the ordinance constitutional. *See id.*

The judge also considered the Town's contract with Andino and found that, under this contract, "Houlton is acting as a 'buyer' in the garbage collection, disposal, and processing markets, and enters those markets 'with the same freedoms and subject to the same restrictions as a private party.'" *Id.* at 44 (quoting *Smithtown,* 66 F.3d at 509). Because the Town acted as a market participant in dealing with Andino, the judge concluded, the contract between the two escapes scrutiny under the dormant Commerce Clause. *See id.*

For two reasons, we are reluctant to place our imprimatur on the district court's bifurcated analysis. First, *Smithtown* and *Babylon* are cutting-edge deci-

sions, and it is unclear to us whether or not the Supreme Court eventually will adopt their *ratio decidendi*. Second, and perhaps more important, although Houlton's waste management scheme shares some features of the Smithtown and Babylon schemes, it differs significantly in requiring that those municipal residents who do not choose to tote their own garbage contract individually with the Town's designated hauler for the purpose of removing residential refuse. *See* 1997 Ordinance § 10–507(1). Moreover, even self-haulers are required to use a designated transfer station. *See id.* § 10–504. The ordinance thus explicitly creates forced business transactions—an element that was present in *Clarkstown*, but lacking in the Second Circuit cases (both of which involved arrangements that avoided forced transactions by the simple expedient of appropriating tax dollars to fund waste management services). This distinction cannot be disregarded, for the Second Circuit's market participation analysis in *Smithtown* and its finding of nondiscrimination in *Babylon* were, at least to some extent, dependent on those communities' expenditures of public funds in support of their contractual arrangements. *See Smithtown*, 66 F.3d at 515 (noting that "Smithtown is spending tax dollars to pay for both [waste collection and disposal] services"); *Babylon*, 66 F.3d at 1283 (distinguishing *Clarkstown* on the ground that "the payment of taxes in return for municipal services is not comparable to a forced business transaction").

We need not probe this point too deeply, however, for the case at hand can be resolved in a more straightforward fashion. We do not interpret *Clarkstown* as explicating a broad-based ban on every flow-control ordinance that happens to be coupled with an exclusive contractual arrangement in favor of an in-state operator. To suggest that every such ordinance violates *Clarkstown* would stretch both Justice Kennedy's language and the logic of the dormant Commerce Clause past the breaking point.

■ The core purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies. *See, e.g., Camps Newfound/Owatonna*, 520 U.S. at 578, 117 S.Ct. 1590 (citing "economic isolationism" as "the very evil that the dormant Commerce Clause was designed to prevent"); *New Energy Co. v. Limbach*, 486 U.S. 269, 273–74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (explaining that the "'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors"); *see also Clarkstown*, 511 U.S. at 390, 114 S.Ct. 1677 ("The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."). It follows, therefore, that if local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 94, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–72, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Harvey & Harvey*, 68 F.3d at 802. In other words, to the extent that in-state and out-of-state bidders are allowed to compete freely on a level playing field, there is no cause for constitutional concern.

It is a logical next step that when the Commerce Clause inquiry focuses on a state or local plan that culminates in an award of an exclusive contract to one of several aspirants (actual or potential), the process by which the contractor is chosen assumes great importance in determining the plan's constitutionality *vel non*. *See Harvey & Harvey*, 68 F.3d at 801. After all, in-state interests are not unduly pampered, nor out-of-state competitors unduly burdened, when a municipality awards an

exclusive contract to a low bidder (from whatever state or region) after a fair and open bidding process. In such circumstances, unrestricted access to the bidding process constitutes unrestricted access to the relevant market.

Applying this tenet, Houlton's 1997 Ordinance does not flout the dormant Commerce Clause. Andino did not become the Town's contractor in a backroom deal, cutting potential competitors off at the pass, but, rather, earned the Houlton contract through its successful completion of a well-advertised, fully competitive bidding process that was accessible to all who coveted the business. The Town issued a detailed RFP after holding a widely publicized meeting, open to all prospective bidders, at which such prospective bidders were able to comment on, and ask questions about, the project. The record contains no hint that the Town restricted the bid protocol to a particular class of bidders, shaped it to favor in-state operators, or slanted it in any way against out-of-state purveyors.[3] The RFP itself includes no terms that either give in-state operators a leg up or disadvantage their out-of-state rivals.

In point of fact, the RFP allows any bidder willing and able to haul and dispose of Houlton's trash to submit a proposal. It does not lock bidders into using a particular transfer station; on the contrary, its terms permit the successful bidder to contract with whomever the bidder chooses (in-state or out-of-state) to process the garbage and effectuate disposal at any lawful site within or without the state. Furthermore, the RFP specifically notes that bidders may request deviations or file alternative proposals.

In response to the RFP, the Town received multiple bids. It awarded the contract to Andino—the low bidder. The contract's seven-year term, though lengthy, does not seem excessive considering the relatively substantial commitment of

equipment and other resources required on the successful bidder's part—and nothing about this duration impacts out-of-state operators differently than their in-state competitors. In short, this open and freely accessible bidding process ensured a level playing field for all interested parties and provided sufficiently broad market access to quell Commerce Clause concerns. Consequently, the Town's garbage disposal scheme does not constitute a per se violation of the dormant Commerce Clause, but instead regulates commerce evenhandedly, with no more than incidental effects on interstate trade.

This brings us to the balancing test. Under this test, we must uphold the 1997 Ordinance "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. In light of the strong local interest in efficient and effective waste management and the virtually invisible burden that the Town's scheme places on interstate commerce, Houlton passes this test with flying colors. *See generally Northwest Cent. Pipeline Corp. v. State Corp. Comm'n,* 489 U.S. 493, 525–26, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 394–95, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). Hence, the district court did not err in entering summary judgment against the appellants on their Commerce Clause claim.

**B.   *Remaining Arguments.***

The appellants' three remaining arguments need not detain us. We note briefly why we regard two of them as unavailing, and why we conclude that the third should be left to the state courts.

**1.   *The Takings Clause.*** The Fifth Amendment's mandate that private property shall not be taken for public use

---

**3.** To be sure, the appellants argue that the contract with Andino was awarded in violation of the procedure required by the town

charter. That is a different issue, and we treat it in Part III(B)(3), *infra.*

without just compensation applies to the states and their political subdivisions through the Fourteenth Amendment. *See Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1897). This protection is not restricted to physical invasions, occupations, or removals of property; in some cases, overly assiduous government regulation can create an unconstitutional taking. Whether a particular restriction implicates the Takings Clause is context-sensitive and hinges on the specific circumstances. *See Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). In mounting such inquiries, courts must weigh especially the character of the government action, its economic impact on the plaintiff, and the degree to which it interferes with the plaintiff's reasonable, investment-backed expectations. *See Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670, 674 (1st Cir.1998).

█ Faulkner perceives a regulatory taking in this case because, after operating his trash-collecting business in Houlton for many years unfettered by municipal tethers, the passage of the 1997 Ordinance curbed his activities and dried up a significant income stream. But this argument swims against a powerful tide: courts steadfastly have rejected the proposition that the grant of an exclusive contract for refuse collection constitutes a taking vis-à-vis other (competing) trash haulers. *See California Reduction Co. v. Sanitary Reduction Works,* 199 U.S. 306, 321–323, 26 S.Ct. 100, 50 L.Ed. 204 (1905); *Gardner v. Michigan,* 199 U.S. 325, 330–31, 26 S.Ct. 106, 50 L.Ed. 212 (1905); *Tri–State Rubbish, Inc. v. Waste Mgmt., Inc.,* 998 F.2d 1073, 1082 (1st Cir.1993). Since we have no reason to question the continuing vitality of this impressive string of cases, we affirm the district court's grant of summary judgment in favor of the defendant on the takings claim.

█ **2. *The Contract Clause.*** The Contract Clause declares that: "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Despite the majestic sweep of this language, the Contract Clause is not energized unless a contractual relationship exists, that relationship is impaired by a change in the law, and the resultant impairment is substantial. *See General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992); *McGrath v. Rhode Island Retirement Bd.,* 88 F.3d 12, 16 (1st Cir.1996). The first two parts of this inquiry are, as in this case, often easily satisfied. Faulkner enjoyed garbage collection contracts with approximately 75 Houlton residents, and the 1997 Ordinance effectively prevents him from fulfilling those contracts. Thus, the controlling question is whether this impairment should be regarded as substantial.

█ In order to weigh the substantiality of a contractual impairment, courts look long and hard at the reasonable expectations of the parties. In this inquiry, it is especially important whether the parties operated in a regulated industry. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 413, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *Mercado–Boneta v. Administracion del Fondo de Compensacion Al Paciente,* 125 F.3d 9, 13 (1st Cir.1997). While Faulkner and his garbage collection customers did business for many years uninhibited by any regulation precisely akin to the 1997 Ordinance, they would have had to be troglodytes not to have known that the waste collection and disposal industry is subject to fairly pervasive regulation. *See, e.g., Clarkstown,* 511 U.S. at 386, 114 S.Ct. 1677 (collecting recent Supreme Court cases dealing with the validity of various aspects of such regulation). Indeed, Houlton's foray into flow control was prompted by the continued regulatory efforts of the State of Maine. In this vein, while the 1995 Ordinance eventually proved abortive, it plainly

adumbrated for Faulkner and his customers that change was in the wind. The general condition of regulation in the waste management industry and the specific foreshadowing provided by Houlton's action in 1995 should have led Faulkner to realize that his collection contracts could not be maintained *ad infinitum.*

■ Viewed through this prism, the question whether the impairment worked by the 1997 Ordinance meets the test of substantiality is close. We need not decide that close question, however, for even a state law that creates a substantial impairment does not transgress the Contract Clause as long as it is appropriate for, and necessary to, the accomplishment of a legitimate public purpose. *See Energy Reserves,* 459 U.S. at 412, 103 S.Ct. 697; *Mercado–Boneta,* 125 F.3d at 15. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. 697. The 1997 Ordinance addresses itself specifically to "ensur[ing] reliable provision of collection and hauling services which will further the interest of public health and safety." 1997 Ordinance (preamble). Health and safety are two mainstays of the police power. *See, e.g., Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Thus, this stated purpose and the ordinance's goal to achieve economies of scale for the benefit of Houlton's residents, *see* 1997 Ordinance (preamble), fit well within the category of remedies for "broad and general social or economic problem[s]" that the Supreme Court has stated will meet its criteria of legitimacy in a Contract Clause context, *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. 697.

■ Upon finding a legitimate public purpose, the next step ordinarily involves ascertaining the reasonableness and necessity of the adjustment of contract obligations effected by the regulation to determine finally whether the regulation offends the Contract Clause. *See id.; Mercado–Boneta,* 125 F.3d at 15. Withal, an exception to this rule exists when the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests. In such instances, a court properly may defer to the legislature's judgment. *See Energy Reserves,* 459 U.S. at 413, 103 S.Ct. 697; *Mercado–Boneta,* 125 F.3d at 15. So it is here: by enacting the 1997 Ordinance, the Town has reshaped the conduct of waste removal within its borders, but has not altered its own fiscal obligations. The waste management system—collectively, the ordinance and the contract entered into pursuant to it—neither requires the outlay of public funds nor relieves the Town's coffers of any financial burdens. Accordingly, we defer to the Town Council's judgment that the system it created through the 1997 Ordinance is a moderate course designed to achieve the permissible purposes stated in the ordinance's preamble. Because the 1997 Ordinance, so viewed, is reasonable in light of the circumstances, *see Mercado–Boneta,* 125 F.3d at 15, the district court did not err in resolving the Contract Clause claim against the plaintiffs.

■ **3.** ***The Town Charter.*** The appellants do not dispute that the initial contract between Andino and the Town was secured through a fair and open competitive bidding process in which Andino was the successful low bidder. This process was mandated by, and fully conformed to, the requirement that "[a]ll purchases by the Town of property, services, and contract rights which exceed five thousand dollars ($5,000.00) shall be conducted by sealed, competitive bidding." Houlton Town Charter § 512, ¶ 3. They assert, however, that the Town violated the charter when it renegotiated Andino's contract to bring it in line with the 1997 Ordinance.[4]

---

4. This renegotiation occurred after the district court had issued a preliminary injunction bar-

The district court rejected this assertion, holding that there was no need for a new round of bidding, and that the renegotiated contract was valid. *See HCC II,* 11 F.Supp.2d at 111–12.

We think that this scenario presents a close question of state law—and one that the district court did not need to reach. After all, the district court had no independent jurisdiction over the town charter claim; and, although 28 U.S.C. § 1367 allows a district court that has jurisdiction over a series of federal claims to entertain related state-law claims that "form part of the same case or controversy," *id.,* it does not oblige the court to continue with those claims if, prior to trial, it disposes of the federal claims. Where, as here, the federal claims upon which the court's jurisdiction depends are resolved before trial, section 1367 confers upon the judge the authority to dismiss a supplemental state-law claim without prejudice. *See Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995); *Martinez v. Colon,* 54 F.3d 980, 990 (1st Cir.1995).

In this instance, the town charter claim is not only difficult, but also novel as a matter of state law. The litigation was in the early stages. Under the circumstances, we conclude that dismissal without prejudice clearly was the option of choice, and that the district court should not have ventured to adjudicate the town charter claim. *See Rodriguez,* 57 F.3d at 1177 (admonishing that "a federal court may be wise to forgo the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious

scope and application"); *see also* 28 U.S.C. § 1367(c)(1).

## IV. CONCLUSION

We need go no further. The Town of Houlton's adoption of a flow-control ordinance, coupled with its grant of an exclusive hauling and disposal contract to a local contractor, does not discriminate on its face against interstate commerce because both in-state and out-of-state providers were allowed to compete for this contract on the same footing. Moreover, since any incidental effects that this waste management scheme may have on interstate commerce correspond to legitimate local interests in efficiency and public health, the plan does not violate the dormant Commerce Clause. By like token, it does not work an unconstitutional taking or impermissibly impugn private contracts. Finally, because the town charter claim depends entirely on state law, we think that the better course is to leave that claim to be litigated in the state courts (should the appellants choose to press it). We therefore direct the district court to modify its judgment to provide that the appellants' claim under the Houlton Town Charter is dismissed without prejudice.

***Affirmed as modified. Costs in favor of the appellee.***

ring implementation of the 1995 Ordinance, predicated on a finding that the Commerce Clause challenge likely would succeed. *See Condon,* 961 F.Supp. at 331. The Town contends that the renegotiation was obligatory pursuant to paragraph 8 of the 1995 contract between Andino and the Town, which reads in its entirety:

> In the event that the Contract Documents or any provision thereof shall be found by the courts to be invalid or unenforceable, then such Documents or provision thereof shall be re-negotiated in good faith by the

parties and made to conform to applicable laws. The invalidity or unenforceability of any provision of a Contract Document shall not affect the validity or enforceability of any other provision of the Document or any other contract Document provided, however, that should the courts declare the exclusive franchise provisions of this Contract to be unlawful, then the parties agree that this Contract is impossible to perform and shall be null and void with no damages due to either party and with no duty to re-negotiate the terms hereof.