**BFI WASTE SYSTEMS OF NORTH AMERICA, INC. Plaintiff,**

v.

**BROWARD COUNTY, FLORIDA, Defendant.**

No. 01–6655–CIV.

United States District Court, S.D. Florida.

June 6, 2003.

Stuart H. Sobel, Siegfried, Rivera, Lerner De la Torre & Sobel, Coral Gables, FL, for Plaintiffs.

Michael W. Moskowitz, Michael J. Kerr, Fort Lauderdale, FL, for Defendants.

### ORDER

GONZALEZ, District Judge.

**THIS MATTER** has come before the Court upon the following motions: (1) the Motion for Summary Judgment (DE # 80) of Defendant Broward County, Florida (the "County"), filed February 3, 2003, and (2) the Cross–Motion for Partial Summary

Judgment (DE # 89) of Plaintiff BFI Waste Systems of North America, Inc. ("BFI"), filed February 28, 2003. For its consideration of this matter, the Court has reviewed the parties' pleadings, motions, statements of undisputed material facts, briefing, affidavits, discovery responses, exhibits, applicable law, and the record in this case.

For the reasons stated herein, the Court **ORDERS** and **ADJUDGES** as follows:

1. The County's Motion for Summary Judgment is **GRANTED IN PART** and **RESERVED IN PART**;

2. BFI's Cross–Motion for Partial Summary Judgment is **DENIED IN PART** and **RESERVED IN PART.**

### I. BACKGROUND [1]

Unless otherwise indicated, the following material facts are not in dispute.

### A. THE INTERLOCAL AGREEMENT AND THE BROWARD SOLID WASTE DISPOSAL DISTRICT

Taking their cue from the Florida Legislature, as expressed in Fla. Stat. Ann. §§ 403.702 *et seq.*, on or about November 25, 1986, the County and twenty-three incorporated municipalities situated in the County (the "Contract Communities") entered into "An Interlocal Agreement with Broward County for Solid Waste Disposal Service" (the "Interlocal Agreement"). The parties' purpose in executing the Interlocal Agreement was to develop jointly a comprehensive, environmentally advanced, solid waste disposal and resource recovery system to process solid waste generated in their respective areas. Additional municipalities have subsequently be-

---

1. This matter shares a common factual background with the matter addressed in the Court's Order reported as *Coastal Carting,*

*Ltd. v. Broward County,* 75 F.Supp.2d 1350 (S.D.Fla.1999).

come signatories to the Interlocal Agreement.

The County undertook its obligations in the Interlocal Agreement in two distinct capacities. On one hand, the County undertook obligations as the County itself. On the other hand, the County undertook obligations as the governmental representative of the unincorporated areas of the County.

Pursuant to the Interlocal Agreement, the County enacted Ordinance No. 87–3. Ordinance No. 87–3 established, among other things, the Broward Solid Waste Disposal District (the "District"), a special district authorized by Fla. Stat. § 125.01(5) and anticipated by the Interlocal Agreement. The District is comprised of the Contract Communities and the County acting as governmental representative of the unincorporated areas. Ordinance No. 87–3 also created the Resource Recovery Board ("RRB"), which is the governing body of the District. The RRB is a nine-member body that represents the County and the Contract Communities comprising the District. The RRB created and maintains the "Plan of Operations," which is the corpus of rules and regulations under which the District is administered.

The core obligation assumed by the County in the Interlocal Agreement is its "Disposal Obligation." The County's Disposal Obligation is defined as "the obligation of the County to provide for the disposal of all solid waste generated in each Contract Community and in the unincorporated County and delivered to a resource recovery system disposal facility . . . ." Interlocal Agreement ¶ 2.8.

To meet its Disposal Obligation, the County agreed in the Interlocal Agreement to cause to be constructed, operated, and maintained, a resource recovery system. The resource recovery system to be constructed included two state of the art resource recovery facilities (the "Facili-

ties"), one for solid waste generated in the northern part of the County and one for solid waste generated in the southern part. The Facilities are sophisticated incinerators that burn solid waste and generate electricity from the process. The ash residue of the processed solid waste is disposed in a landfill.

## B. THE COUNTY'S SERVICE AGREEMENTS WITH WHEELABRATOR

In August 1986, the County executed various agreements with corporate relatives of Wheelabrator North Broward, Inc. and Wheelabrator South Broward Inc. (collectively, "Wheelabrator") to construct, equip, operate and maintain the Facilities. The County financed the construction and equipping of the Facilities by issuing Resource Recovery Revenue Bonds, with an aggregate principal amount of $590,000,000. The proceeds from the bond issuance were used to construct the Facilities. The North Facility began commercial operations in August 1991; the South Facility did so in March 1992. Wheelabrator owns and operates the Facilities.

Among the agreements between the County and Wheelabrator are two "Amended and Restated Solid Waste Disposal Service Agreements" (the "Service Agreements"), one each for the North and South Facilities. Under the Service Agreements, Wheelabrator agreed to operate and maintain the Facilities and to accept for disposal, up to the Facilities' effective capacity, solid waste brought to the Facilities by or on behalf of the County and the Contract Communities.

In exchange for providing such services, the County agreed to pay Wheelabrator service fees and service charges and to reimburse Wheelabrator for certain costs. These service fees, service charges and other costs essentially comprise the Coun-

ty's cost of meeting its Disposal Obligation to the Contract Communities and the unincorporated areas under the Interlocal Agreement.

The service fees and service charges owed Wheelabrator under the Service Agreements are determined in the following manner. The Service Agreements set forth a minimum number of tons of solid waste that the County is obligated to cause to be delivered annually to the Facilities ("the Put–or–Pay Tonnage"). The Service Agreements also set forth a formula to determine a per-ton fee (the "Net Tipping Fee"), which Wheelabrator charges the County to dispose of the solid waste. If during a particular contract year the number of tons actually delivered to the Facilities is less than the Put–or–Pay Tonnage, the Service Agreements provide that a "Put–or–Pay Shortfall" exists. When a Put–or–Pay Shortfall exists, the County must then pay a one-off service charge to Wheelabrator, based upon the shortfall tonnage and the Net Tipping Fee. In short, the County agreed to pay Wheelabrator service fees and, if necessary, a service charge in each contract year amounting to at least the annual Put–or–Pay Tonnage multiplied by the Net Tipping Fee. In several past contract years, a Put–or–Pay Shortfall has existed, and the County has had to pay Wheelabrator a service charge to compensate it for insufficient service fees.

## C. CONTRACTS WITH SOLID WASTE HAULERS IN THE DISTRICT

In the Interlocal Agreement, the County and the Contract Communities agreed to use two separate mechanisms to try to ensure that the County would meet its Put–or–Pay Tonnage obligation to Wheelabrator. First, the Contract Communities and the County, on behalf of the unincorporated areas, agreed to pass (and did pass) flow control ordinances requiring solid waste haulers to deliver all solid waste generated in their respective areas to a designated Facility of the resource recovery system. Second, and directly at issue here, the Contract Communities and the County agreed to include in their contracts with solid waste haulers a provision requiring the hauler to deliver all solid waste generated in the relevant area to a designated Facility and to pay a per-ton tipping fee to the County on the delivered solid waste. *See* Interlocal Agreement, ¶ 3.3.

## D. THE NEXUS BETWEEN THE HAULERS' TIPPING FEES TO THE COUNTY AND WHEELABRATOR'S TIPPING FEES

The per-ton tipping fees that solid waste haulers pay to the County under their hauling contracts to dispose of solid waste at the Facilities are tied to the per-ton Net Tipping Fees that the County pays Wheelabrator under the Service Agreements. The haulers' tipping fees paid to the County comprise, in essence, the revenue stream that the County uses to pay the service fees it owes to Wheelabrator under the Service Agreements. The service fees in turn comprise the County's Disposal Obligation to the Contract Communities and the unincorporated areas under the Interlocal Agreement.

Therefore, if there were a Put–or–Pay Shortfall in a given year, meaning that haulers delivered less than the Put–or–Pay Tonnage to the Facilities, the County's revenue stream for paying Wheelabrator's Service fees—*i.e.*, the tipping fees paid by the haulers to the County—would likewise be short. The County would therefore need to marshal revenue sources other than the tipping fees it received from haulers to pay the one-off service charge to Wheelabrator and meet its Disposal Obligation to the Contract Communities and the unincorporated areas. The Interlocal

Agreement accounts for such a potentiality by authorizing the RRB to impose a one-off service charge on all owners of improved real property in the District in the event that the County cannot meet its Disposal Obligation through tipping-fee revenues. This service charge would in turn be passed along by the County to Wheelabrator.

### E. THE COASTAL CARTING DECISION AND ITS AFTERMATH

The constitutionality—under the Commerce Clause of the United States Constitution—of the County's flow control ordinance, which it passed as representative of the unincorporated areas, was the subject of *Coastal Carting, Ltd. v. Broward County*, 75 F.Supp.2d 1350 (S.D.Fla.1999). There, this Court held that the County's flow control ordinance, Ordinance No. 87–4, unconstitutionally discriminated against interstate commerce, citing, *inter alia, C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). *See Coastal Carting*, 75 F.Supp.2d at 1357. The Court found that the County's flow control ordinance regulated the local solid waste disposal market and unconstitutionally discriminated against out-of-state solid waste disposal service providers in favor of the Facilities. *See Coastal Carting*, 75 F.Supp.2d at 1356.

In the wake of this Court's *Coastal Carting* decision, the Contract Communities and the County took several steps. First, on or about May 21, 1999, the Contract Communities and the County executed the "Fifth Amendment Interlocal Agreement with Broward County for Solid Waste Disposal Service" (the "Fifth Amendment"). The preface to the Fifth Amendment refers to this Court's decision in *Coastal Carting* and the Supreme Court's decision in *Clarkstown* and states as follows:

> [i]t is the intent of this amendment to require the parties to the Interlocal Agreement to conform the laws and rules governing [the District] to the case law regarding flow control and remove all barriers, restriction, impediments and regulations of whatever nature from any solid waste generated in Broward County which is destined for disposal outside of the State of Florida.

Fifth Amendment at 1. The Fifth Amendment revised paragraph 3.3 of the Interlocal Agreement to provide the following:

> Each party agrees to include in any contract or contract amendments with haulers executed after the date of execution hereof, a provision that all solid waste shall be delivered to the resource recovery system transfer or disposal facility or facilities designated in the plan of operations and to enforce such provision, *with the exception of waste generated in Broward County which is shown to be destined for transportation to any destination outside of the State of Florida.*

Fifth Amendment, ¶ 3.3 (emphasis added). The RRB adopted a similar revision to the Plan of Operations.

On July 13, 1999, the County amended Ordinance No. 87–4 by enacting Ordinance No. 1999–42. The preface to Ordinance No. 1999–42 states:

> even though the County disputes the Court's findings, in an effort to avoid future litigation which challenges the validity of flow control ordinances adopted by the County and the [Contract Communities], it is the intent of this amendment to conform the laws and rules governing [the District] to the case law regarding flow control and to remove all barriers, restrictions, impediments and regulations of whatever nature from any solid waste generated in Broward County which is destined for disposal outside of the State of Florida, consistent with the flow control ordinances of other jur-

isdictions which have withstood constitutional scrutiny by providing this exclusion . . . .

Ordinance No. 1999–42. The amendment then restates the flow control language of Ordinance No. 87–4: "the County on behalf of the unincorporated area of Broward County, Florida, hereby directs that all solid waste generated within the unincorporated area of the county be delivered to the resource recovery system transfer or disposal facility or facilities designated in the plan of operation under the Interlocal Agreement . . . ." Ordinance No. 1999–42, § 2(2).

The amendment then provides the following:

> Waste generated in Broward County which is shown to be destined for transportation to any destination outside of the State of Florida based upon a sworn affidavit of a hauler delivered to the County reciting facts which evidence the transportation and disposal of waste outside the State of Florida is excluded from the flow restrictions contained herein.

Ordinance No. 1999–42, § 2(5). The amendment also provides that the County "will confirm [sic] the terms and conditions of any agreement it may have with a hauler of solid waste to the terms and conditions of the Interlocal Agreement." Ordinance No. 1999–42, § 2(3).

### F. THE FACTS THAT GAVE RISE TO THIS DISPUTE

BFI is a hauler of solid waste. In 1996, after a competitive bidding process—in which the County incorporated its tipping fees into the bid documents—the County, representing the unincorporated areas, and BFI's predecessor in interest, Browning Ferris Industries of Florida ("Browning Ferris"), executed four "Amended and Restated Agreements for the Furnishing of Solid Waste Collection Services" (the "Hauling Contracts"). In 1998, by assignment agreement between Browning Ferris and BFI, BFI assumed Browning Ferris's rights and obligations under the Hauling Contracts.

Under the Hauling Contracts, BFI enjoys an exclusive license to collect residential solid waste in four (out of eight) districts of the unincorporated areas of the County and a non-exclusive license to collect commercial solid waste in those same districts. Consistent with the Interlocal Agreement, the County's pre-*Coastal Carting* flow control ordinance, and the Plan of Operations, the Hauling Contracts all contain a provision stating the following:

> [a]ll responsibilities for the safe and proper collection, transportation, and disposal of Residential Solid Waste and Commercial Solid Waste shall be with [BFI] while same is in [BFI's] possession. [BFI] must deliver such solid waste to a Designated Disposal Facility or Facilities as directed by the Contract Administrator in writing and shall pay any *COUNTY* fees or charges established for the use thereof.

Hauling Contract, ¶ 3.4 (the "Designation Clause").

In exchange for BFI providing the services and assuming the obligations identified in the Hauling Contracts, the County pays BFI a per-unit fee—also incorporated into the bid documents—for each residential property. The County pays BFI the per-unit fees with monies the County collects from property owners though their property tax bills.

After the *Coastal Carting* decision and the subsequent amendments to the Interlocal Agreement, the County's flow control ordinance, and the Plan of Operations, BFI desired to dispose of the solid waste it collected under the Hauling Contracts at facilities located outside the State of Florida. BFI alleges that such out-of-state facilities charge lesser tipping fees than the

County charges BFI to dispose of waste at the Facilities.

On September 27, 2000, BFI submitted affidavits to the County identifying an out-of-state destination to which it intended to deliver solid waste collected under the Hauling Contracts. In response, the County advised BFI that BFI was required to deliver solid waste collected under the Hauling Contracts only to the designated Facilities. On October 6, 2000, the County sent a letter to BFI stating that, the County's amendment to the flow control ordinance notwithstanding, BFI was contractually obligated under paragraph 3.4 of the Hauling Contracts (the Designation Clause) to deliver all of the solid waste BFI collects in the unincorporated districts to the designated Facilities of the resource recovery system. BFI nevertheless delivered solid waste it collected pursuant to the Hauling Contracts to out-of-state facilities from September 2000 until December 2000 (and again from June 2001 until August 2001). On November 11, 2000, the County sent a letter to BFI advising BFI that it was in breach of the Hauling Contracts.

### G. BFI'S COMPLAINT AND THE MOTIONS FOR SUMMARY JUDGMENT

BFI filed the instant Complaint on April 23, 2001. In Count I, BFI seeks damages and other monetary relief pursuant to 42 U.S.C. § 1983. BFI alleges in Count I that it was damaged as a result of the County's pre-*Coastal Carting* flow control ordinance (Ordinance No. 87–4), which this Court ruled violated the Commerce Clause. BFI also alleges that the County's post-*Coastal Carting* conduct—i.e., the County's insistence that the Designation Clause still obligates BFI to deliver solid waste only to the Facilities—also violates the Commerce Clause, has damaged BFI, and continues to damage BFI. BFI claims that it has been damaged because BFI has

paid higher tipping fees than it otherwise would have paid to deliver and dispose of the solid waste it collected under the Hauling Contracts.

In Count II, BFI seeks declaratory and injunctive relief under 42 U.S.C. § 2201, *et seq.*, the Declaratory Judgment Act. BFI claims that the County effectively amended the Hauling Contracts by (1) amending the Interlocal Agreement and the County's flow control ordinance, and (2) declaring in the amended flow control ordinance that the County "will confirm [sic] the terms and conditions of any agreement it may have with a hauler of solid waste to the terms and conditions of the Interlocal Agreement." BFI seeks a judicial declaration that the County has effectively amended the Hauling Contracts to allow BFI to deliver solid waste out of state and that the County is violating the Commerce Clause by insisting that the Designation Clause still obligates BFI to deliver solid waste to the Facilities.

In Count III, BFI claims that, the Designation Clause of the Hauling Contracts having (allegedly) been amended, the County has breached the Hauling Contracts by preventing BFI from delivering solid waste to out-of-state disposal facilities. BFI again claims that it has been damaged because, as a result of the County's breach, BFI has paid higher tipping fees than it otherwise would have paid.

The County, in its Motion for Summary Judgment, requests summary judgment in its favor as to all counts in BFI's Complaint. The County argues that the Designation Clause of the Hauling Contracts does not constitute regulation of interstate commerce at all. Rather, the County argues that, through its agreements with BFI and Wheelabrator, the County participates in the solid waste collection and solid waste disposal markets: conduct exempt from the strictures of the Commerce

Clause. The County further argues that the amendments to the Interlocal Agreement and the flow control ordinance did not effectively amend the Designation Clause, and, therefore, that provision remains in full effect.[2]

In its Cross–Motion for Summary Judgment, BFI seeks summary judgment as to all issues of liability raised in its Complaint.

## II. LAW AND ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be entered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1231 (Fed.Cir.2001)

### B. THE COMMERCE CLAUSE AND MARKET PARTICIPANT DOCTRINE

■ The Commerce Clause is primarily an affirmative grant of power to Congress. It states: "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3. "The Framers granted

Congress plenary authority over interstate commerce in the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Oregon Waste Sys., Inc. v. Dept. Of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (internal quotations omitted) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). The Supreme Court has, however, long interpreted the Commerce Clause not only "as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes*, 441 U.S. at 326, 99 S.Ct. 1727. This aspect of the Commerce Clause constraining state action is referred to as the "negative" or "dormant" Commerce Clause.

■ Consistent with the principles animating the Commerce Clause, the Supreme Court has generally "held that the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce.'" *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Hughes*). Here, "discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* (citations omitted). "If a restriction on commerce is discriminatory, it is virtually per se in-

**2.** Neither party has addressed in its briefs whether BFI is entitled to damages under 42 U.S.C. § 1983 due to any injury caused by the County's pre-*Coastal Carting* flow control ordinance. The Court has therefore reserved judgment on this issue, as stated in the Conclusion of this Order. *See infra.*

The County has also filed counterclaims against BFI for breach of contract or, alternatively, for rescission or reformation of the Hauling Contracts. The County has not moved for summary judgment on its counterclaims, and therefore this Order does not render summary judgment as to them.

valid." *Id.* (citations omitted). "By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

■ Before one ventures down this path of negative Commerce Clause analysis, however, one must first determine whether the challenged state or local government action constitutes "regulation" of interstate commerce at all. The Supreme Court, beginning with *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) and *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), established the proposition that "when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause." *White v. Mass. Council of Construction Employers, Inc.,* 460 U.S. 204, 208, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). Indeed, "if a State [or local government] is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (citations omitted). This proposition is generally referred to as the market participant doctrine or market participant exception.

In *Reeves,* the Supreme Court indicated that state and local governments participate in markets, rather than regulate them, when they buy or sell goods or services as private parties do. Citing *Alexandria Scrap,* the *Reeves* Court stated, "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace.... There is no indication of

a constitutional plan to limit the ability of States themselves to operate freely in the free market." *Reeves,* 447 U.S. at 437–38, 100 S.Ct. 2271 (citations omitted).

The Supreme Court, however, has not precisely defined the contours of the market participant exception. In *White,* for example, the Supreme Court held that a Boston mayoral executive order—which required all construction projects funded in whole or part with city funds to be performed by a workforce at least half comprised of Boston residents—did not violate the Commerce Clause. *See id.* at 215, 103 S.Ct. 1042.

In so holding, the majority addressed the dissenters' argument that the executive order at issue went beyond the proper bounds of the market participant exception because it affected contracts between the contractors hired by the city and the contractors' own employees. *See id.* at 211, n. 7, 103 S.Ct. 1042. Conceding that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," the *White* Court stated:

> We find it unnecessary in this case to define those limits with precision, except to say that we think the Commerce Clause does not require the city to stop at the boundary of formal privity of contract. In this case, the mayor's executive order covers a discrete, identifiable class of economic activity in which the city is a major participant. Everyone affected by this order is, in a substantial if informal sense, "working for the city."

*See id.*

The Supreme Court revisited the proper scope of the market participant exception in *South–Central Timber.* In *South–Central Timber* the Supreme Court examined an Alaskan administrative code provision requiring contracts for sale of state-owned

timber include a provision obligating the buyer to process partially the purchased timber within the state before shipping outside the state, a so called "primary-manufacture requirement." *See South-Central Timber*, 467 U.S. at 84–85, 104 S.Ct. 2237.

Alaska argued, *inter alia*, that the primary-manufacture requirement fell within the market participant exception because Alaska was acting as a seller of timber, not as a regulator of the timber market; the primary-manufacture requirement was just a term in a contract between a seller and a buyer. *See id.* at 96, 104 S.Ct. 2237. Alaska further argued, citing *White,* that if Boston could compel its contractors to hire local workers, Alaska could require its timber-buyers to patronize in-state timber processors. *See id.*

Rejecting Alaska's argument the Supreme Court stated, "[t]hat privity of contract is not always the outer boundary of state activity does not necessarily mean that the Commerce Clause has no application within the boundary of formal privity." *South-Central Timber*, 467 U.S. at 97, 104 S.Ct. 2237. The Supreme Court emphasized that "the market-participant doctrine permits a State to influence 'a discrete, identifiable class of economic activity in which it is a major participant.'" *See id.* (quoting *White*, 460 U.S. at 211, n. 7, 103 S.Ct. 1042.).

The Supreme Court elaborated:

The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. Unless the "market" is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may

not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry.

*South-Central Timber*, 467 U.S. at 97–98, 104 S.Ct. 2237.

The Supreme Court agreed with the plaintiff in *South-Central Timber* that "although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant." *See id.* at 98, 104 S.Ct. 2237. The Supreme Court found this aspect of the primary-manufacture requirement problematic in part because "[i]nstead of merely choosing its own trading partners, the State is attempting to govern the private, separate economic relationships of its trading partners...." *See id.* at 99, 104 S.Ct. 2237.

## C. THE MARKET PARTICIPANT DOCTRINE IN SOLID WASTE MANAGEMENT CASES

While the Eleventh Circuit has not yet done so, other circuit courts have examined solid waste disposal systems similar to the Broward Solid Waste Disposal District in light of the market participant doctrine framework delineated by the Supreme Court in, *inter alia*, *Alexandria Scrap, Reeves, White* and *South-Central Timber.* One such case, the facts of which this Court finds materially indistinguishable from the instant case, is *SSC Corp. v. Town of Smithtown,* 66 F.3d 502, 509 (2d Cir.1995), *cert. denied,* 516 U.S. 1112, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996).

In *Smithtown,* the Second Circuit considered a solid waste disposal system jointly created by the towns of Smithtown and Huntington, New York. *See id.* at 506–07. The towns executed a municipal cooperation agreement, with goals similar to those of the Interlocal Agreement. *See id.* The

towns financed the construction of a solid waste incinerator, as the County financed construction of the Facilities, with proceeds obtained from issuing bonds. *See id.* at 507.

Pursuant to agreements between the towns and Ogden Martin Systems ("Ogden"), a solid waste disposal contractor like Wheelabrator, Ogden constructed, operated and maintained the incinerator. *See id.* at 506. Ogden also owned the incinerator. *See id.* Also under the agreements, the towns agreed to pay Ogden set service fees, regardless of the volume of solid waste actually delivered to the incinerator. *See id.* Ogden, in turn, agreed to accept for disposal all of the solid waste the towns caused to be delivered to the incinerator. *See id.*

Smithtown charged solid waste haulers tipping fees on solid waste delivered to the incinerator, which Smithtown in turn used to pay the service fees it owed Ogden. *See id.* at 505, 507. Like the County, Smithtown used a two-part approach to ensure that a steady stream of solid waste was delivered to the incinerator. First, it passed a flow control ordinance requiring Smithtown-contracted haulers to deliver solid waste to a town-designated facility only. *See id.* at 507. And second, it utilized a form hauling contract that included a designation clause obligating haulers to deliver solid waste collected under the contract to the Ogden incinerator. *See id.* Smithtown then competitively bid the hauling contracts, incorporating its tipping fee in the bid documents. *See id.* at 507–08. Smithtown, like the County, also paid its haulers with monies derived from user fees assessed on homeowners' property tax bills. *See id.* at 508.

SSC, the plaintiff-hauler in *Smithtown,* challenged both Smithtown's flow control ordinance and the designation clause in its hauling contract with Smithtown under the Commerce Clause. *See id.* The Sec-

ond Circuit held that Smithtown's flow control ordinance did not constitute market participation and did violate the Commerce Clause as a local government regulation that discriminated against interstate commerce. *See id.* at 514. The Second Circuit also held, however, that the designation clause of the hauling contracts between Smithtown and SSC was immune from Commerce Clause scrutiny under the market participation doctrine. *See id.* at 515–16.

The Second Circuit reasoned that "[t]he central question in determining whether the contract constitutes 'market participation' by Smithtown is whether it more closely resembles Boston's local-hiring requirements in *White,* or Alaska's local-processing requirements in *South–Central Timber.*" *See id.* at 514. "In both cases, the government reached beyond 'the boundary of formal privity of contract' to influence the economic relationships between its trading partners and other parties." *See id.* (citing *South–Central Timber,* 467 U.S. at 96, 104 S.Ct. 2237 and *White,* 460 U.S. at 211, 103 S.Ct. 1042).

Like BFI in the instant case, SSC argued that Smithtown's designation clause violated the Commerce Clause because "Smithtown, like Alaska in *South–Central Timber,* is flexing its economic muscle in the waste collection market to *regulate* the downstream market of waste disposal." *See id.* at 515 (emphasis original). The Second Circuit rejected SSC's argument, reasoning that "Smithtown is a 'major participant' in two 'discrete, identifiable, classes of economic activity': waste collection and waste disposal." *See id.* (quoting *White,* 460 U.S. at 211, n. 7, 103 S.Ct. 1042.) The Second Circuit stated that Smithtown had, in essence, contracted out the provision of solid waste collection and solid waste disposal services to private companies, rather than provide those services to its residents with Smith-

town's own employees and equipment. *See id.* "Smithtown is spending tax dollars to pay for both of these services, just as Boston was spending tax dollars to pay the salaries of its contractors' construction workers in *White.*" *Id.* The Second Circuit concluded that, to the extent that Smithtown was expending public funds and entering into contracts for solid waste collection and disposal services, it was a participant in both of those distinct markets. *See id.*

## D. THE HAULING CONTRACTS AND SERVICE AGREEMENTS IN LIGHT OF WHITE, SOUTH–CENTRAL TIMBER AND SMITHTOWN

■ The Court finds the Second Circuit's analysis in *Smithtown* compelling. This Court, like the Second Circuit did in *Smithtown*, found the County's flow control ordinance to be unconstitutional in light of the Supreme Court's *Clarkstown* decision. *See Coastal Carting, supra.* The Court nevertheless finds that the Designation Clause contained in the County's Hauling Contracts with BFI is exempt from Commerce Clause scrutiny because the County, with its contracts with BFI and Wheelabrator, is acting as a market participant in both the solid waste collection and solid waste disposal markets and, therefore, is not regulating either of those markets through those contracts.

■ This distinction between the County's flow control ordinance and the Designation Clause in the Hauling Contracts is not a sophistic one. As the Second Circuit noted, a state or local government's actions constitute market participation "only if a private party could have engaged in the same actions." *See Smithtown,* 66 F.3d at 512. The County's flow control ordinance did not and does not fit this description. No private party could promulgate or enforce with sanctions an ordinance like the flow control ordinance. By contrast, private parties clearly can, and do, enter into contracts that contain provisions like the Designation Clause. Under the principles articulated in *Alexandria Scrap, Reeves, White* and *South–Central Timber,* the County can do the same without implicating the dormant Commerce Clause.

BFI nevertheless urges the Court to construe the Designation Clause as analogous to Alaska's primary-manufacture requirement, which the Supreme Court held did not constitute market participation in *South–Central Timber.*[3] The County's actions differ from the State of Alaska's in *South–Central Timber* in at least two constitutionally significant respects. First, and most important, the County is a major participant in *both* the solid waste collection *and* the solid waste disposal markets through its contracts with haulers and with Wheelabrator.[4] The County expends sub-

---

**3.** BFI also urges the Court to follow the reasoning and conclusion of the Sixth Circuit in *Huish Detergents, Inc. v. Warren County, Kentucky,* 214 F.3d 707 (6th Cir.2000). There, the Sixth Circuit reversed a district court grant of the defendants' motion to dismiss. In *Huish,* the Sixth Circuit found that the county-defendant was not acting as a market participant because it was not purchasing or selling solid waste processing services, but rather by ordinance had compelled its residents to purchase processing services from a single county-contracted service provider. *See id.* at 715–16. The Court finds *Huish* to be distinguishable from the instant case. It is undisputed here that the County is assessing

fees from County residents on their property tax bills and expending those public funds to purchase collection and disposal services. As the Sixth Circuit itself noted in *Huish,* "the County could have achieved the same result [in *Huish*], without implicating the Commerce Clause, by hiring [the service provider] as its exclusive waste hauler using public funds to pay for the service. But the County rejected that strategy, opting instead to apply its regulatory leverage by forcing residents to do the purchasing for it." *See id.* at 717.

**4.** The County also notes, *inter alia,* that it operates a landfill as a further example of its

stantial public funds assessed through property tax bills to procure both collection and disposal services for its residents. The State of Alaska on the other hand, through its timber sales contracts, sought to affect a market—the timber processing market—in which it did not participate. *See South–Central Timber, supra.*

Second, unlike the State of Alaska's primary-manufacture requirement, the Designation Clause does not affect BFI's business relationships with third parties, *e.g.,* Wheelabrator. Recall that, in *South–Central Timber,* the Supreme Court found it particularly troubling that "[i]nstead of merely choosing its own trading partners, the State is attempting to govern the private, separate economic relationships of its trading partners...." *See id.* at 99, 104 S.Ct. 2237. The County is doing no such thing.

The Court explained, *supra,* that the tipping fees BFI pays when it delivers solid waste to the Facilities are paid *to the County, not to Wheelabrator.* The Designation Clause of the Hauling Contract does not compel BFI to consummate a business relationship with Wheelabrator or any other entity. Rather, the Designation Clause simply obligates BFI (1) to deliver the solid waste it collects to a location of the County's choosing and (2) to pay, as part of BFI's consideration to the County under the Hauling Contracts, a tipping fee to the County upon delivery.

For market participation doctrine purposes, this is crucial. Under the Hauling Contracts the County and BFI exchange the following consideration: the County pays BFI a per-unit fee for BFI's collection and disposal of solid waste generated in the subject unincorporated areas and grants BFI an exclusive license to provide residential collection services and a non-exclusive license to provide commercial participation in the solid waste disposal market.

collection services in those same areas; BFI, for its part, provides the collection services and disposal services and pays the County tipping fees on the solid waste it collects. The Designation Clause thus embodies a fundamental element of the consideration flowing from BFI to the County under the Hauling Contracts. The clause does not require BFI to patronize a third-party service provider, as the primary-manufacture requirement in *South–Central Timber* did.

And as the Second Circuit explained in *Smithtown,* arranging the exchange of consideration in this manner serves important economic purposes. *See Smithtown,* 66 F.3d at 515. The tipping fees BFI and the other haulers in the District pay to the County discourage the haulers from insinuating out-of-District garbage into the solid waste they deliver to the Facilities. *See Smithtown,* 66 F.3d at 515. The Facilities' capacity is of course finite, and the purpose of creating the District was to provide solid waste disposal services to the Contract Communities and the unincorporated areas, not to communities that are not party to the Interlocal Agreement. The tipping fees therefore help the County (and the Contract Communities) to police the performance of haulers under the hauling contracts in order to achieve the legitimate purposes of the Interlocal Agreement.

The tipping fees also provide haulers with an incentive to forecast accurately their anticipated collection and disposal costs when they submit bids to the County and the Contract Communities. As the Second Circuit noted, "[i]f each bid area generates less waste than contemplated by the prevailing estimate, the contractor keeps the difference between the bid and the actual disposal costs. If the area generates more garbage than expected, the hauler must still pay the tipping fees and

absorb the excess." *See id.* The tipping fees paid by the haulers to the County therefore help to ensure that the bidding process functions well.

That the County utilizes this particular arrangement to achieve its purposes does not alter the underlying reality of the relationships among the County, BFI and Wheelabrator. The County uses public funds (1) to pay BFI to collect solid waste and deliver it to the Facilities and (2) to pay Wheelabrator to dispose of the solid waste. As the Second Circuit made clear, "that SSC [like BFI] pays tipping fees to use the incinerator does not detract from the reality that Smithtown [like the County] is the one consuming—and ultimately paying for—those disposal services." *See id.* The County is not therefore using its economic weight in one market to exert some regulatory effect in a market in which it does not participate. Instead, through its contracts, the County participates in the solid waste collection and the solid waste disposal markets.

## E. DID THE COUNTY EFFECTIVELY AMEND THE HAULING CONTRACTS THROUGH THE FIFTH AMENDMENT AND ORDINANCE NO. 1999–42?

 The Designation Clause, therefore, is exempt from scrutiny under the Commerce Clause. BFI also claims, however, that the County effectively amended the Designation Clause by amending the Interlocal Agreement and its flow control ordinance after *Coastal Carting.* BFI argues that, pursuant to this alleged amendment, BFI may now deliver solid waste to an out-of-state facility of BFI's choice, so long as it first provides the County with an affidavit to this effect. The Court finds BFI's contention unpersuasive.

It is axiomatic that, when interpreting the meaning of any law, regulation, ordinance or contract, a Court's starting point

is the document's plain language. *See, e.g., In re Yates Dev., Inc.,* 256 F.3d 1285, 1288 (11th Cir.2001). The language of the Fifth Amendment to the Interlocal Agreement, the amended flow control ordinance (Ordinance No. 1999–42), and the Hauling Contracts themselves, unambiguously makes clear that the County has not effectively amended the Designation Clause.

The Fifth Amendment provides that the County and the Contract Communities will include a revised designation clause permitting haulers to deliver waste out of state *"in any contract or contract amendments with haulers executed after the date of execution hereof."* Fifth Amendment, ¶ 3.3 (emphasis added). "Hereof" clearly refers to the Fifth Amendment itself, which the County and the Contract Communities executed on June 22, 1999. The Hauling Contracts were executed in 1996. Paragraph 3.3 of the Fifth Amendment therefore does not apply to the Hauling Contracts.

The language of Ordinance No. 1999–42 further confirms the Court's interpretation of the Fifth Amendment. Through Ordinance No. 1999–42, the County amended Ordinance No. 87–4 in response to this Court's ruling in *Coastal Carting* that the County's flow control ordinance—not the Designation Clause in its Hauling Contracts—was unconstitutional under the Commerce Clause. The preamble to Ordinance No. 1999–42 makes plain that the measure is to conform the "laws and rules" governing the District to the case law regarding flow control, not to amend the County's contracts with haulers. *See supra.*

BFI makes much ado of the section of Ordinance No.1999–42 stating that the County *"will confirm* [sic] the terms and conditions of any agreement it *may have* with a hauler of solid waste to the terms and conditions of the Interlocal Agreement." Ordinance No. 1999–42, § 2(3)

(emphasis added). Note that the language of this provision is phrased in the future and conditional tense, not the present tense. The County manifestly did *not* state, for example, that it *"hereby conforms* the terms and conditions of any agreement it *currently has* with haulers of solid waste to the terms and conditions of the Interlocal Agreement."

The County instead expressed its intent, consistent with the Fifth Amendment, to conform future hauling contracts it might execute to the terms and conditions of the Interlocal Agreement. And even if Ordinance No.1999–42 could be reasonably construed to mean that the County thereby effectively conformed its existing hauling contracts to the Interlocal Agreement (which it cannot), the Designation Clause of the Hauling Contracts with BFI still would be unaffected. As the Court noted, the Interlocal Agreement, as amended by the Fifth Amendment, now provides that only hauling contracts *executed after June 1999* must include a modified Designation Clause, excepting solid waste destined for delivery out of state. The 1996 Hauling Contracts are therefore still consistent with the Interlocal Agreement as amended by the Fifth Amendment.

Third, as the County points out, the Hauling Contracts themselves provide that they "may not be changed, altered, or modified except by an instrument in writing signed by all parties against whom enforcement of such change would be sought." Hauling Contract, ¶ 18.12. The County and BFI have executed no such instrument reflecting the elements attendant to an enforceable agreement, such as a meeting of minds and a bargained for exchange.

### III. CONCLUSION

For the foregoing reasons the Court finds that the Designation Clause of the Hauling Contracts is immune from scruti-

ny under the Commerce Clause of the United States Constitution under the market participant doctrine. The Court further finds that the County has not amended the Designation Clause by amending the Interlocal Agreement and its flow control ordinance.

Neither party, however, has addressed in its motion papers whether BFI is entitled to recover compensatory damages under 42 U.S.C. § 1983 due to an injury, if any, caused by the County's unconstitutional pre-*Coastal Carting* flow control ordinance, as BFI claims in ¶ 64a of its Complaint. The Court therefore **RESERVES** judgment on that issue.

The Court hereby **GRANTS** summary judgment in favor of the County and against BFI as to BFI's claims for relief in ¶¶ 64b-d of Count I and in the entirety of Counts II and III of BFI's Complaint. The Court hereby **DENIES** BFI's Cross–Motion for Partial Summary Judgment as to all claims, except that made in ¶ 64a of its Complaint, on which the Court **RESERVES** judgment.